Westlaw.

Slip Copy

Page 1

Slip Copy, 2005 WL 1189881 (E.D.Tex.)
**(Cite as: Slip Copy)**

C

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Texas, Marshall
Division.
CIENA CORPORATION Plaintiff
v.
NORTEL NETWORKS INC., Nortel Networks
Corp. Nortel Networks Limited Defendants
**No. 2:05 CV 14.**

May 19, 2005.

Sidney Calvin Capshaw, III, Brown McCarroll,
Longview, TX, Gregory L. Lippetz, Bingham
McCutchen LLP, San Francisco, CA, for Plaintiff.
Samuel Franklin Baxter, Attorney at Law, Marshall,
TX, for Defendants.

MEMORANDUM OPINION AND ORDER 1

> FN1. This opinion constitutes the Court's
> findings of fact and conclusions of law.
> Any finding found to a conclusion is
> adopted as such and any conclusion found
> to be a finding is adopted as such.

DAVIS, J.
*1 Before the Court is the Motion for Preliminary
Injunction to Enforce Forum Selection Agreement,
and the Supplement thereto, filed by Defendants,
Nortel Networks Inc., Nortel Networks Limited,
and Nortel Networks Corporation (collectively "
Nortel") (Docket Nos. 16 and 24). Nortel's motion
seeks to enjoin Plaintiff, Ciena Corporation ("Ciena
"), from further pursuing or participating in the
International Trade Commission ("ITC") action
commenced by Ciena against Nortel and Flextronics
International Ltd. and Flextronics Telecom Systems
Ltd. (collectively "Flextronics"). Nortel's motion
also requests the Court require Ciena to withdraw
its Complaint against Nortel and Flextronics before

the ITC. Having considered the parties' written
submissions and oral arguments, the Court
GRANTS Nortel's motion for preliminary
injunction.

BACKGROUND

On January 17, 2003, Nortel and Ciena settled a
multi-forum patent case between them. To
document their settlement, Ciena and Nortel entered
into a Confidential Settlement Agreement and
Release ("Settlement Agreement"). The Settlement
Agreement is governed by California law. The
Settlement Agreement did not resolve all the parties'
outstanding patent disputes, but provided for a
two-year standstill during which time neither would
file an action, suit, or proceeding for patent
infringement against the other ("the Two-Year
Standstill") to allow them the opportunity to
negotiate a cross license resolving their remaining
disputes. The parties agreed that after the Two-Year
Standstill expired, actions for patent infringement
between them would be brought in a single forum:
the United States District Court for the Eastern
District of Texas, Marshall Division.

The Two-Year Standstill and forum selection clause
are contained in Section 4 of the Settlement
Agreement, which provides in pertinent part:
4. *Two-Year Covenant Not to Sue* ...
(a) For a period commencing on the Effective Date
and continuing for two years thereafter (referred to
for convenience as the "Two-Year Period"), the
parties agree:
(i) it will neither bring nor cause to be brought any
action, suit, or proceeding against the other or any
of its Affiliates based upon or arising out of any
claim, liability or demand alleging that, in the case
of Nortel, any CIENA Product infringes any Nortel
Patent, and, in the case of CIENA, any Nortel
product infringes any CIENA Patent;
....
(b) The two-year covenant not to sue described in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 2

Slip Copy, 2005 WL 1189881 (E.D.Tex.)
**(Cite as: Slip Copy)**

this Section 4 is solely an agreement not to bring an action or proceeding of the type set forth in paragraph 4(a) in violation of the terms hereof and is not a release or discharge of liability or damages of any kind....

(c) After the expiration of such Two-Year Period, in the event either Party or any Affiliate of a Party (referred to for convenience as the "plaintiff") brings an action for patent infringement against the other (referred to for convenience as the "defendant" ) or against any of the defendant's Affiliates, then both the plaintiff and the defendant, on behalf of themselves and each of their Affiliates, agrees to bring such action only in, and irrevocably consents to the exclusive personal jurisdiction of, the United States District Court, Eastern District of Texas, Marshall Division.

**\*2** ....

(e) This Settlement Agreement constitutes a full and complete defense to, and may be used to obtain an injunction against, any action, suit, claim or other proceeding of any type set forth in this Section 4 (Two Year Covenant not to Sue) which may be prosecuted, initiated or attempted in violation of the terms hereof.

(emphasis added). In Section 8.4, the parties addressed the effect of a breach of the Settlement Agreement:8.4 *Breach.* With the exception of the obligations expressly conditioned upon the performance of those obligations described in Sections 7 (Obligation to Negotiate Patent Cross License), 8.2 (Nortel Conditions) or 8.3 (CIENA Conditions) by the other Party, respectively, nothing herein shall be construed as relieving a Party or any of its Affiliates of its obligations to perform as required herein.

On January 17, 2005, when the Two-Year Standstill expired, Ciena filed this action for patent infringement in the Marshall Division, consistent with the Settlement Agreement's forum selection clause. Ciena's Original Complaint alleged that Nortel infringes six of Ciena's patents. Ciena has since amended its complaint-dropping one patent and adding two additional ones-and now asserts a total of seven patents against Nortel in this case.

On February 25, 2005, Ciena filed a second action against Nortel with the ITC in Washington, D.C. (the "ITC Complaint"). In the ITC Complaint, Ciena asserted that certain Nortel long-haul and metro optical networking products infringe two of Ciena's patents, neither of which Ciena currently asserts in the present action. Ciena requested the ITC initiate an investigation pursuant to Section 337 of the Tariff Act of 1930 concerning Nortel's alleged infringement and issue an order prohibiting the importation of infringing optical networking products.

On March 14, 2005, Nortel filed with this Court its Answer and Counterclaims to Ciena's Second Amended Complaint. Among other claims and defenses, Nortel asserted that Ciena breached the Settlement Agreement's forum selection clause by filing the ITC Complaint. On March 14, 2005, Nortel also filed the present motion, seeking a preliminary injunction enjoining Ciena from pursuing or participating in the ITC action and requiring Ciena to withdraw its ITC Complaint against Nortel. The same day, Ciena amended the ITC Complaint to add Flextronics as a respondent, alleging that Flextronics and Nortel had entered into an agreement whereby Flextronics provides manufacturing services for Nortel and manufactures the accused infringing products for importation into the United States and/or sells the accused infringing products to Nortel for importation and sale in the United States.

On March 25, 2005, Nortel filed a Supplement to its Motion for Preliminary Injunction, requesting the Court to enjoin and restrain Ciena under the forum selection clause from participating in and further pursuing its ITC action against Nortel and Flextronics. Nortel also requested that the Court order Ciena to withdraw its ITC Complaint both as to Nortel and Flextronics.

### APPLICABLE LAW

*Contract Interpretation*

**\*3** Contract interpretation is a question of state law.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 3

Slip Copy, 2005 WL 1189881 (E.D.Tex.)
**(Cite as: Slip Copy)**

*Tex. Instruments, Inc. v. Tessera, Inc.,* 231 F.3d 1325, 1329 (Fed.Cir.2000). The Settlement Agreement is governed by California law. Settlement Agreement § 10.3. The parties' mutual intent at the time they formed the contract governs the contract's interpretation. CAL. CIV.CODE § 1636; *Tessera,* 231 F.3d at 1329. Unless the parties used words in their technical sense, the words used should be "understood in their ordinary and popular sense, rather than according to their strict legal meaning." CAL. CIV.CODE § 1644. When the parties use technical words, those technical words should be "interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense." CAL. CIV.CODE § 1645.

*Preliminary Injunction Standards*

"The basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). Federal Circuit law governs the issue of whether to grant the preliminary injunction because it involves a procedural matter arising from substantive issues that are unique to the Federal Circuit's jurisdiction. *Tessera,* 231 F.3d at 1328. To establish entitlement to a preliminary injunction, a moving party must demonstrate: 1) a reasonable likelihood of success on the merits, 2) irreparable harm, 3) balance of hardships in its favor, and 4) public interest in favor of the injunction. *Tessera,* 231 F.3d at 1329 (citing *Chrysler Motor Corp. v. Auto Body Panels, Inc.,* 908 F.2d 951, 952 (Fed.Cir.1990)).

ITC ACTION AGAINST NORTEL

*Reasonable likelihood of success on the merits*

a. The forum selection clause's applicability to ITC proceedings

The Supreme Court has held that a "forum [selection] clause should control absent a strong showing that it should be set aside." *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). The Supreme Court based this ruling on the strong public policy favoring enforcement of agreed-upon forum selection clauses in commercial transactions. *Id.; see also Fireman's Fund Ins. Co. v. M.V. DSR Atl.,* 131 F.3d 1336, 1338 (9th Cir.1997) (holding that forum selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances"). California, whose law governs the Settlement Agreement, also recognizes a strong public policy in upholding forum selection clauses. *See Smith, Valentino & Smith, Inc. v.Super. Ct.,* 17 Cal.3d 491, 131 Cal.Rptr. 374, 551 P.2d 1206, 1209 (Cal.1976). [FN2]

> FN2. Ciena argues that the standard applicable to waiver, i.e., clear and convincing evidence, is applicable here. The Court disagrees; the issue is enforcement of a contractual forum selection clause and not intentional relinquishment of a known right. Yet, even if the Court were to apply the clear and convincing evidence standard asserted by Ciena, Nortel has met its burden for injunctive relief.

Nortel and Ciena agreed that, after the Two-Year Standstill expired on January 17, 2005, any "action for patent infringement" against the other would be brought only in the United States District Court, Eastern District of Texas, Marshall Division. The primary crux of the parties' dispute is whether " action for patent infringement" applies to the proceedings in the ITC.

*4 Nortel, who brings this motion, argues that " action" encompasses ITC proceedings. To support its position, Nortel cites various cases and treatises that refer to ITC proceedings as "actions." Nortel also contends that the parties intended to resolve all future conflicts in a single forum through the forum selection clause; therefore, the parties must have intended "actions" to include ITC proceedings.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1189881 (E.D.Tex.)
**(Cite as: Slip Copy)**

Ciena argues that the parties did not intend "actions" to include ITC proceedings. Ciena points out that while the parties used "action, suit, or proceeding" in the Two-Year Standstill provision, they used only "actions" in the forum selection clause. According to Ciena, this demonstrates that the parties did not intend the forum selection clause to be as broad as the Two-Year Standstill. Ciena argues that the cases using "action" to describe ITC proceedings were not defining the term and directs the Court to cases and commentaries that describe disputes before the ITC as "proceedings." Ciena also asserts that many federal statutes and regulations refer to disputes in the ITC as "proceedings," but refer to disputes in district court as "actions." Finally, Ciena argues that Nortel's interpretation produces the absurd result of an implied cross-license for the parties' foreign patents because the parties cannot litigate those patents in the Eastern District of Texas.

Sophisticated business entities, such as Ciena and Nortel, are charged with "adequate knowledge of the basic patent law actions and remedies available to litigants, including the available forum and venues." *Tessera,* 231 F.3d at 1329-30. Thus, when they negotiated the Settlement Agreement, both parties had constructive knowledge that they could dispute infringement before the ITC or before a district court.

At the time Ciena and Nortel negotiated the Settlement Agreement, the Federal Circuit Court had decided *Tessera,* in which the court had to determine whether "litigation," as used in a licensing agreement's forum selection clause, encompassed actions before the ITC. *Id.* at 1325. The court determined that litigation did include ITC proceedings. Because the ITC is not located in California, the parties intended to exclude the ITC as an available forum when they agreed to bring all " litigation" California. *Id.* at 1331. In reaching this conclusion, the court frequently referred to Section 337 ITC investigations as an "action[s]." *Id.* at 1330, 1331, 1332.

In addition to *Tessera,* other Federal Circuit opinions refer to Section 337 ITC investigations as " actions." *See, e.g., Jazz Photo Corp. v. United States Int'l Nat'l Trade Comm'n,* 264 F.3d 1094,

1102 (Fed.Cir.2001); *Tex. Instruments, Inc. v. Cypress Semiconductor Corp.,* 90 F.3d 1558, 1562 (Fed.Cir.1996). In addition, ITC opinions refer to ITC investigations as "actions." *See, e.g., In the Matter of Certain Hardware Logic Emulation Sys. & Component Thereof,* Inv. No. 337-TA-383, 1996 ITC LEXIS 445 at *5 (ITC Sept. 11, 1996); *In the Matter of Certain Condensing, Parts Thereof & Prods. Containing Same, Including Air Conditioners for Autos.,* Inv. No. 337-TA-334, 1997 ITC LEXIS 262, at *34 (ITC Sept. 10, 1997). At least one treatise refers to Section 337 investigations as "actions." Donald K. Duvall, Unfair Competition and the ITC: Actions Before the International Trade Commission Under Section 337 of the Tariff Act of 1930.

**\*5** Ciena cites *SSIH Equipment S.A., v. United States Int'l Nat'l Trade Comm'n,* 718 F.3d 365 (Fed.Cir.1983), which Ciena claims is binding precedent. Ciena contends *SSIH* holds that "a proceeding before the Commission is not a civil action." *See id.* at 371. This misapplies the court's finding in *SSIH.* In *SSIH,* the Federal Circuit was determining a statutory amendment's applicability to ITC proceedings. *Id.* The amendment stated it applied to "civil actions." *Id.* The court found "civil action" was intended to be construed to not include ITC proceedings. *Id.* Contrary to Ciena's contention, *SSIH* is not binding precedent on this Court because the interpretation issues are different. In *SSIH,* the court was interpreting Congress's intent in using "civil action" in a statute. *Id.* This Court must determine the parties' intent in using "action" in their private Settlement Agreement. *See Tessera,* 231 F.3d at 1329 ("[T]he mutual intention of the parties at the time the contract is formed governs interpretation.") (quoting *AIU Ins. Co. v.Super. Ct.,* 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253, 1264 (1990)). While *SSIH* may be one of the many cases that shaped the parties' understanding of " action['s]" meaning, it is certainly not controlling or even directly on point.

Although Ciena argues that the parties' use of " action, suit, or proceeding" in the Two-Year Standstill provision and "actions" in the forum selection clause indicates the parties intended the provisions to have different scopes, it is clear the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 5

Slip Copy, 2005 WL 1189881 (E.D.Tex.)
**(Cite as: Slip Copy)**

parties used the words interchangeably when the entire Settlement Agreement is examined. In Section 4(a), the parties agreed they would not bring "any *action, suit, or proceeding*" against one another for two years. (emphasis added). Section 4(b) states, "The two-year covenant not to sue described in this Section 4 is solely an agreement not to bring an *action or proceeding* of the type set forth in paragraph 4(a) ...." (emphasis added). Under Ciena's interpretation that "action" has a different meaning from "suit" or "proceeding," Section 4(b), which describes the Two-Year Standstill as applying to an "action or proceeding," would limit Section 4(a), which states the standstill applies to any "action, suit, or proceeding," Additionally, because the forum selection clause only applies to "actions," under Ciena's interpretation, a party could bring a "suit" for patent infringement anywhere. This is surely not what the parties intended. Further, in setting forth injunctive relief as a remedy for violation of the Settlement Agreement, Section 5 inserts the word "claim" into the action, suit, proceeding language: "This Settlement Agreement constitutes a full and complete defense to, and may be used to obtain an injunction against any *action, suit, claim, or other proceeding* of any type, which may be prosecuted, initiated or attempted in violation of the terms hereof ...." (emphasis added). [FN3]

> FN3. Section 5 also allows for attorneys' fees "incurred in defending against any *suit, action or claim* brought or attempted in violation of the terms of this Settlement Agreement." (emphasis added). Under Ciena's interpretation, although an injunction is available against any action, suit, claim, or other proceeding, attorneys' fees would only be available if defending a suit, action, or claim but not if defending " proceedings." This may support the argument that disputes before the ITC are " proceedings," but it does not aid in clarifying the meaning of "action."

*6 Ciena offers no definitions that coherently differentiate the terms action, suit, claim, and proceeding as they are used throughout the

Settlement Agreement. Nor are these terms defined in the Settlement Agreement. Technical words are " interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense." CAL. CIV.CODE § 1645. While these terms may have technical distinctions, these distinctions are often ignored even by those in the legal profession, as demonstrated in the sources cited above. *See, e.g., Tessera,* 231 F.3d at 1330, 1331, 1332. Thus, as used in the Settlement Agreement, "actions" includes disputes before the ITC.

Ciena argues this interpretation produces the absurd result of an implied cross licence between the parties on all of their foreign patents. The Two-Year Standstill provision applies to "Ciena Patent[s]" and "Nortel Patent[s]." The Settlement Agreement defines "Ciena Patent(s)" and "Nortel Patent(s)" to include foreign and domestic patents that the parties had rights in on the Settlement Agreement's effective date or were acquired during the Two-Year Standstill. The forum selection clause does not use these defined terms, but instead uses the phrase "action for patent infringement against the other." If the forum selection clause applies to " Ciena Patent(s)" and "Nortel Patent(s)," as Ciena's argument supposes, it would be inapplicable to any patents either party acquires after the Two-Year Standstill expired. Under this interpretation, either party could bring a patent infringement suit in any forum on any patent either party acquires today, entirely defeating the parties' intent to consolidate their patent litigation in a single forum. Further, because the parties did not use the defined terms, the Court logically infers the parties did not intend to imply the defined terms' meanings in that provision; if they had, the parties would have used the defined terms. Accordingly, Ciena's argument that this interpretation produces an absurd cross licence on the parties' foreign patents lacks merit. [FN4] For all these reasons, Nortel is reasonably likely to prevail in proving Ciena breached the forum selection clause.

> FN4. Whether the forum selection clause applies to the parties' foreign patents is not before the Court, and the Court will not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        Page 6

Slip Copy, 2005 WL 1189881 (E.D.Tex.)
**(Cite as: Slip Copy)**

speculate on the clause's effect on litigation involving foreign patents.

b. Ciena's defenses to the forum selection clause

Ciena puts forth several reasons for why Nortel should be precluded from asserting its rights under the forum selection clause. Ciena argues that Nortel did not negotiate with Ciena in good faith during the Two-Year Standstill, and therefore failed to satisfy a condition precedent to enforce the forum selection clause. According to Ciena, Nortel's unclean hands should prevent Nortel from obtaining equitable relief.

Nortel presented a valid explanation for why it did not participate in the licensing negotiations. Ciena does not contest Nortel's claim that Ciena insisted on having a third-party advisor attend the parties' first negotiation. Nortel requested the third party execute a non-disclosure agreement that would have created an ethical wall preventing the third party's employees who receive Nortel's confidential information from representing Nortel's competitors in future engagements. The third party refused to agree to Nortel's requests, and Ciena refused to meet with Nortel without the third party present. As a result, the parties did not meet to negotiate a cross license.

*7 These facts do not demonstrate Nortel's bad faith. Ciena argues that Nortel's request was unreasonable because its one-sided nature did not place any confidentiality burdens on Nortel. But only Nortel, not the third party, was risking its confidential information with a competitor. Because the third party's confidential information was not vulnerable, the one-sided confidentiality agreement was reasonable and does not impugn Nortel's good faith. Additionally, under Section 8.4 of the Settlement Agreement, good faith negotiation is not a condition precedent to operation of the forum selection clause.

Ciena also argues that Nortel failed to comply with the Settlement Agreement's thirty-day notice and cure provision. This argument also lacks merit. Compliance with the notice and cure provision, especially in light of the need for expedited relief,

would have been futile and is therefore excused under California law. *See Van Gammeren v. City of Fresno,* 51 Cal.App.2d 235, 124 P.2d 621, 623 (Cal.Dist.Ct.App.1942) ("The law does not require useless acts from litigants as prerequisites to seeking relief from the courts."); *Norcen Energy Res. v. Pac. Gas & Elec. Co.,* No. C-94-0911-VRW, 1995 U.S. Dist. LEXIS 21943, at *28-29 (N.D.Cal. Nov. 4, 1995) (applying California law and denying motion to dismiss alleging that counter claimant failed to provide required notice under contract because such notice would have been futile); *see also* CAL. CIV.CODE § 3532 ("The law neither does nor requires idle acts. "). Alternatively, Nortel did give Ciena notice, at the latest, on March 14, 2005, by filing its preliminary injunction motion. The hearing on that motion was held thirty days later. Ciena did not avail itself of the intervening opportunity to cure by withdrawing its ITC Complaint. Thus, the contractual provision was complied with prior to entry of this Preliminary Injunction.

Based on the foregoing, Nortel is likely to overcome Ciena's arguments that Nortel is estopped from enforcing the forum selection clause. Therefore, Nortel is reasonably likely to prevail on its argument that Ciena breached the forum selection clause by filing the ITC action.

*Substantial threat of irreparable injury*

Nortel has established that it will be irreparably harmed if the ITC action proceeds. Nortel will have to defend itself simultaneously in the ITC and the District Court. If Nortel is forced to fight on two fronts, it will suffer inconvenience, disruption of its business, loss of good will, and financial business hardship from the duplicative actions. Nortel's key employees will be required to testify not once, but twice, in hearings and trial. This disruption, as well as other disruptions established by Nortel, will cause irreparable harm, as they cannot be compensated with money damages. Further, Nortel will be deprived of its bargained-for forum-an Article III judge's court and jury in the United States District Court for the Eastern District of Texas. *See Tex. Instruments Inc. v. Tessera, Inc.,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1189881 (E.D.Tex.)
**(Cite as: Slip Copy)**

No. C-00-2114, slip op. at 5-7 (N.D.Cal. March 6, 2001) (finding substantial threat of irreparable injury in similar circumstances).

### Balance of Hardships

**\*8** The balance of hardships tips in favor of Nortel. In Section 4(e), Nortel and Ciena agreed to the entry of an injunction in the event either party violated Section 4's terms. Although the Court does not treat this agreement as conclusive, it is nonetheless entitled to substantial weight. *See id.* at 6 (finding that given the likelihood Tessera had no right bring its ITC action, Tessera' speculative hardship of slower relief in district court was of little weight); *cf. Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 69 (2d Cir.1999) (upholding a permanent injunction in an employment contract where the parties had stipulated that a breach of a non-compete provision would cause irreparable injury).

The injunction will not work a material hardship to Ciena, as, for all practical purposes, this Court can grant Ciena any relief it could have obtained in the ITC. *See Tessera,* 231 F.3d at 1330. An injunction will not cause Ciena undue hardship or deny Ciena access to the only available forum. Ciena may seek relief for the alleged infringement in this Court, as it has chosen to do for several other patents. If Ciena is able to prove Nortel's infringement, this Court can fashion an injunctive remedy that will allow Ciena much the same relief it could obtain before the ITC. Besides also awarding damages, this Court can enjoin Nortel from making, using, selling, offering for sale, or importing devices that are proved to infringe. *See Tessera,* 231 F.3d at 1330; *NTP, Inc. v. Research in Motion, Ltd.,* 392 F.3d 1336, 1344 (Fed.Cir.2004) (describing procedural history that included the district court issuing an injunction against "further manufacture, use, importation, and/or sale" of accused products). While the United States Customs Service will not automatically seize any infringing imports upon this Court's judgment, Ciena can take the additional step of requesting they do so. *See Tessera,* 231 F.3d at 1330. In the particular circumstances of this case, any alleged differences in the scope of relief

available from the Court and the ITC are immaterial. Further, the parties bargained away any additional relief the ITC could provide when they agreed the Eastern District of Texas would be the exclusive venue for future patent infringement actions.

### Public interest

Public interest will be served by the injunction because public policy favors the enforcement of forum selection clauses. "Enforcement of valid forum selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system." *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 33, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (Kennedy, J. concurring). California public policy also favors enforcement of forum selection clauses. *Smith, Valentino & Smith, Inc.,* 131 Cal.Rptr. 374, 551 P.2d at 1209.

### Conclusion as to Nortel

After considering Nortel's likelihood of success on the merits, the substantial threat of irreparable injury to Nortel, the balance of hardships between the parties, and the public interest, the preliminary injunction as to Ciena's participation in the ITC proceeding against Nortel is warranted. Accordingly, the Court will issue a preliminary injunction in a separate order.

### ITC ACTION AGAINST FLEXTRONICS

**\*9** Nortel moves the Court to include Ciena's participation in the ITC action as to Flextronics in the preliminary injunction. In June 2004, Nortel entered into an Asset Purchase Agreement with Flextronics and sold its optical product manufacturing unit, including its St. Laurent Facility in Canada, to Flextronics. Before the sale, Nortel manufactured the accused products in the ITC action at this facility. Flextronics purchased Nortel's production equipment, inventory, accounts receivable, prepaid expenses, goodwill, and other

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 8

Slip Copy, 2005 WL 1189881 (E.D.Tex.)
**(Cite as: Slip Copy)**

assets. Nortel transferred to Flextronics all of Nortel's production activities carried on at the St. Laurent Facility, including product assembly, integration and testing, and product repair activities. Flextronics offered employment to the employees who previously worked for Nortel in the St. Laurent facility. After the purchase, Flextronics continued to manufacture the same products for Nortel that Nortel had previously manufactured for itself. The Court addresses the same four factors in determining whether to include the Flextronics action in the preliminary injunction.

*Reasonable likelihood of success on the merits*

Four independent grounds exist for finding that Nortel is reasonably likely to succeed in proving the forum selection clause applies to Flextronics: (1) the "closely related" doctrine, (2) the "customer suit " doctrine, (3) the first sentence of Section 10.6 of the Settlement Agreement, which applies the terms of the Settlement Agreement to successors, and (4) the second sentence of Section 10.6, which applies the terms of the Settlement Agreement to contract manufacturers.

a. "Closely-related" basis

Under California law, a forum selection clause applies to a range of parties who are closely related to the signatories. *Bugna v. Fike,* 80 Cal.App.4th 229, 233, 95 Cal.Rptr.2d 161 (Cal.Ct.App.2000); *Lu v. Dryclean U.S.A., Inc.,* 11 Cal.App.4th 1490, 1494, 14 Cal.Rptr.2d 906 (Cal.Ct.App.1992). A third party is closely related and subject to a forum selection clause if: (1) it agreed to be bound by the terms of the agreement, (2) the contracting parties intended the agreement to bind the third party, or (3) there is "a defined and intertwining business relationship with a contracting party." *Bugna,* 80 Cal.App.4th at 233, 95 Cal.Rptr.2d 161; *see also Lipcon v. Underwriters at Lloyd's, London,* 148 F.3d 1285, 1299 (11th Cir.1998). As the Court will discuss, Ciena and Nortel intended Flextronics receive the Settlement Agreement's benefits. Additionally, as already partially described, Flextronics and Nortel have a defined and

intertwined business relationship. Flextronics exclusively manufactures for Nortel the accused products, which Nortel designs. Their intertwined relationship is also shown in the premise of Flextronics's liability to Ciena, which is entirely predicated on Nortel's infringement.

b. "Customer-suit" basis

The customer-suit doctrine also supports Nortel's reasonable likelihood of success. The customer-suit exception allows a court to stay a first-filed suit against customers when the manufacturer brings a later-filed declaratory judgment action. *Katz v. Lear Siegler, Inc.,* 909 F.2d 1459, 1464 (Fed.Cir.1990); *Codex Corp. v. Milgo Elec. Corp.,* 553 F.2d 735, 737-38 (1st Cir.1977). Underlying the customer-suit doctrine is the preference that infringement determinations should be made in suits involving the true defendant in the plaintiff's suit, i.e., the party that controls the product's design, rather than in suits involving secondary parties, i.e. customers. *See Codex,* 553 F.2d at 737-38. Typically, the doctrine is applied to give priority to a manufacturer's later-filed declaratory judgment action over the plaintiff's infringement suit against the manufacturer's customers. *Id.* Although the doctrine has been articulated in terms of customers, the same rationale is applicable here. *See* CAL. CIV.CODE § 3511 ("Where the reason is the same, the rule should be the same"); *SAES Getters, S.P.A. v. Aeronex, Inc.,* 219 F.Supp.2d 1081, 1093 (S.D.Cal.2002) (referring to the doctrine in terms of "secondary parties" rather than limiting it to customers and manufacturers). Nortel designs the products accused in the ITC action and, if the Court were to order Ciena to withdraw its ITC action against Nortel, but not Flextronics, "either as a matter of contract, or good business, or in order to avoid the damaging impact of an adverse ruling against its products," Nortel will be under immense pressure to intervene in the ITC action to protect its accused products. *See Codex,* 553 F.2d at 737-38. Additionally, Nortel may be contractually obligated to defend Flextronics. [FN5] Like customers in the typical application of the customer-suit exception, Flextronics is merely a secondary party. *See SAES Getters, S.P.A.,* 219 F.Supp.2d at 1093.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 1189881 (E.D.Tex.)
(Cite as: Slip Copy)

FN5. The manufacturing agreement between Nortel and Flextronics obligates Nortel to "indemnify and defend Flextronics against any claim or action brought against Flextronics by a third party " if the infringement claim is based on Flextronics' manufacture of Nortel products.

*10 Ciena argues the customer-suit exception is inapplicable to Flextronics because its conditions have not been met. Specifically, Ciena argues that: (1) Ciena cannot obtain the relief it seeks in the ITC from this Court, (2) Flextronics has not appeared in this action, (3) Flextronics has not agreed to by bound by the results in this case, and (4) this Court cannot provide relief in as timely a matter as the ITC.

Ciena's concerns are more academic than realistic. If the ITC finds the products Flextronics manufactures infringes Ciena's patents, it can issue an order prohibiting the importation of those products. *See SSIH,* 718 F.2d at 370. Pursuant to their manufacturing agreement, when Flextronics internationally ships Nortel's products, title passes to Nortel immediately prior to importation into the receiving country. Further, Flextronics manufactures the allegedly infringing products solely for Nortel and is contractually prohibited from selling them to others. Therefore, any injunction this Court issues against Nortel would achieve the same effect as an ITC order against importation, rendering Ciena's first, second, and third concerns moot. As to Ciena's last concern, while the ITC may reach a final decision on infringement before this Court does, with trial set in June of 2006, this Court's judgment is not far behind. The few months of sooner enforcement through the ITC are outweighed by the effect this Court's judgment could have on the patent's validity. *See SSIH,* 718 F.2d at 369 (describing that the ITC modified its exclusion order to comport with a district court's finding that the patents were invalid). Accordingly, the reasons to enjoin the action against Flextronics under the customer suit basis far outweigh Ciena's arguments against doing so.

c. Successor basis

The parties agreed that the terms of the Settlement Agreement "inure[s] to the benefit of (in accordance with the terms hereof) and shall bind the successors, assigns, representatives, beneficiaries and attorney(ies) of the parties, and each of them." Settlement Agreement § 10.6. Although "successor" is not a defined term, the parties described a successor-in-interest in Section 10.5 as one to whom "either Party ... from time to time assigns, transfers, sells or exchanges ... all or substantially all of the assets of any business unit." Nortel transferred its optical product manufacturing unit to Flextronics. In the transaction, Flextronics acquired Nortel's Canadian facility, production equipment, inventory, accounts receivable, prepaid expenses, goodwill, and other assets. Flextronics acquired all of Nortel's production activities including product assembly, integration and testing, and product repair activities carried on at the St. Laurent Facility. Accordingly, Flextronics is a successor under Section 10.6 as that term is described in Section 10.5.

Flextronics is also a successor as that term is used in California law. Under California law, a successor is "[o]ne that succeeds or follows; one who takes the place that another has left, and sustains the *like part or character,....*" *Perez v. 222 Sutter Street Partners,* 222 Cal.App.3d 938, 272 Cal.Rptr. 119, (Cal.Ct.App.1990) (quoting from Black's Law Dictionary, 5th ed.). FN6 Flextronics clearly meets the California definition of successor as "one that succeeds or follows" as to Nortel's Canadian manufacturing plant. *See generally Knudsen Dairy Prods. Co. v. State Bd. of Equalization,* 12 Cal.App.3d 47, 53, 90 Cal.Rptr. 533 (Cal.Ct.App.1970) ("It is clear that Dairy was the successor [as that term is used in the California Tax code] to Pix in that Dairy acquired the major operating assets of Pix, and continued to operate the business. It is hard to imagine a more complete take-over of a going business than what occurred here."); *cf. Kaminski v. W. MacArthur Co.,* 175 Cal.App.3d 445, 453-54, 220 Cal.Rptr. 895 (Cal.Ct.App.1985) (holding that a successor of a corporation could be held liable under successor liability theory when successor had acquired

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 1189881 (E.D.Tex.)
(Cite as: Slip Copy)

Page 10

considerable assets of predecessor, including customer records, good will, equipment, office furniture, and hundreds of thousands of dollars worth of inventory, and successor retained experienced personnel, customer lists, and reputation of predecessor). Nortel's argument is especially persuasive since it is Flextronics's takeover of Nortel's manufacturing role that led to Flextronics's alleged infringement. Because Flextronics is the successor to Nortel's optical manufacturing business unit at which the products accused in the ITC action are manufactured, Flextronics is entitled to the benefit of the forum selection clause.

> FN6. Ciena argues that Flextronics does not meet California's stricter definition of successor-in-interest, but that argument is irrelevant because Section 10.6 of the Settlement Agreement used the term "successors."

### d. Contract manufacture basis

*11 Under Section 10.6 of the Settlement Agreement, Flextronics is also a third party beneficiary of the forum selection clause. The second sentence of Section 10.6 states, "Each entity identified in Sections 3 (Release) and 4 (Two-Year Covenant [N]ot to Sue) is an intended third party beneficiary of this Settlement Agreement." Section 4(a)(iii) includes "Nortel Manufacturers" as parties that were not to be sued during the Two-Year Standstill. "Nortel Manufacturers" is defined in Section 1.13 as "any and all contract manufacturers, developers, assemblers, suppliers, and independent contractors who have written agreements in place with Nortel or any of its Affiliates to manufacture and sell Nortel products to Nortel, Nortel Affiliates, and/or Nortel's and/or its Affiliates' Customers." Flextronics is a contract manufacturer to Nortel and fits within the term "Nortel Manufacturer" as the parties defined it. Because Nortel Manufacturers are identified in Section 4 and there is no dispute that Flextronics is a Nortel Manufacturer, Flextronics is therefore an intended third party beneficiary of the forum selection clause.

Ciena's argument that the Two-Year Standstill benefits contract manufacturers but the forum selection clause does not is without merit, since the parties clearly intended the forum selection clause to apply to contract manufacturers. If the forum selection clause did not apply to contract manufacturers and customers, the parties could easily circumvent the forum selection clause by suing the other's customers and contract manufacturers in any venue. This would pressure the other party-as the primary party in interest-to intervene, eviscerating the forum selection clause. *See Codex,* 553 F.2d at 737-38. Sophisticated parties, such as these, would never have intended the language of Section 10.6 to render their agreed forum selection clause meaningless.

### *Substantial threat of irreparable injury*

Because the ITC action against Nortel and Flextronics is based on Nortel products, and Nortel would be forced to defend Flextronics before the ITC even if Nortel were no longer a party to the action, the analysis of this factor is the same as that discussed regarding the ITC action against Nortel.

### *Balance of hardships*

Ciena argues that issuing the preliminary injunction as to the ITC action against Flextronics will prevent Ciena from receiving relief it could not receive from this Court. Specifically, Ciena argues that a judgment from this Court that Nortel infringes Ciena's patents would not stop Flextronics from importing infringing products on Nortel's behalf because the injunction would apply only to the parties and not the products. For reasons already discussed, this argument also lacks merit. Contractually, Flextronics may only manufacture the allegedly infringing products for Nortel. Further, according to the contract between Nortel and Flextronics, title to the products passes from Flextronics to Nortel immediately prior to importation. Thus, this Court could issue an order that sufficiently enjoins the importation of Nortel's infringing products. Accordingly, this factor weighs in favor of Nortel.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 1189881 (E.D.Tex.)
**(Cite as: Slip Copy)**

*Public policy*

**\*12** For the same reasons the public policy factor
favors the preliminary injunction as to the ITC
action against Nortel, it also favors issuing the
injunction as to the ITC action against Flextronics.

*Conclusion as to Flextronics*

The preliminary injunction factors regarding Ciena's
participation in the ITC action against Flextronics
weigh in favor of issuing the preliminary injunction.
Accordingly, the Court will issue the appropriate
order.

CONCLUSION

For the reasons discussed above, the preliminary
injunction factors favor preliminarily enjoining
Ciena's participation in the ITC action as to both
Nortel and Ciena. Finding that a bond is necessary,
the Court provides for one in the preliminary
injunction. The Court will enter a preliminary
injunction in accordance with this Memorandum
Opinion and Order.

So ORDERED.

E.D.Tex.,2005.
Ciena Corp. v. Nortel Networks Inc.
Slip Copy, 2005 WL 1189881 (E.D.Tex.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3337551 (Trial Motion, Memorandum
and Affidavit) Plaintiff Ciena Corporation's Reply
in Support of its Opening Claim Construction Brief
(Oct. 27, 2005)
• 2005 WL 3337552 (Trial Motion, Memorandum
and Affidavit) Nortel Networks, Inc., Nortel
Networks Limited, and Nortel Networks
Corporation's Reply Claim Construction Brief of
the Nortel Patents-In-Suit (Oct. 27, 2005)
• 2005 WL 3337550 (Trial Motion, Memorandum
and Affidavit) Plaintiff Ciena Corporation's
Opposition to Nortel's Opening Claim Construction
Brief (Oct. 20, 2005)

• 2005 WL 2666914 (Trial Motion, Memorandum
and Affidavit) Defendant Nortel's Proposal for Case
Management (Aug. 29, 2005)
• 2005 WL 2666915 (Trial Motion, Memorandum
and Affidavit) Ciena Corporation's Proposal for
Case Management (Aug. 29, 2005)
• 2005 WL 320621 (Trial Pleading) Complaint for
Patent Infringement and Demand for Jury Trial
(Jan. 17, 2005)
• 2:05cv00014 (Docket) (Jan. 17, 2005)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1554382 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
COMMISSARIAT A L'ENERGIE ATOMIQUE,
Plaintiff,
v.
DELL COMPUTER CORPORATION, et al.,
Defendants.
COMMISSARIAT A L'ENERGIE ATOMIQUE,
Plaintiff,
v.
TOTTORI SANYO ELECTRONIC CO., LTD.,
Defendant.
COMMISSARIAT A L'ENERGIE ATOMIQUE,
Plaintiff,
v.
BEST BUY CO. OF MINNESOTA, INC., et al.,
Defendants.
COMMISSARIAT A L'ENERGIE ATOMIQUE,
Plaintiff,
v.
FUJITSU LIMITED, et al., Defendants.
COMMISSARIAT A L'ENERGIE ATOMIQUE,
Plaintiff,
v.
TATUNG COMPANY, et al., Defendants.
**No. Civ.A. 03-484-KAJ, Civ.A. 03-857-KAJ,
Civ.A. 03-931-KAJ, Civ.A. 03-1036-KAJ, Civ.A.
04-99-KAJ.**

May 13, 2004.

Richard D. Kirk, Morris, James, Hitchens &
Williams, Wilmington, DE, for Plaintiffs and
Counter-Defendant.
Richard L. Horwitz, Potter Anderson & Corroon,
LLP, Wilmington, DE, for Defendants and
Counter-Claimant.
William J. Marsden, Jr., Fish & Richardson, P.C.,
Robert H. Richards, III, William J. Wade, Richards,
Layton & Finger, M. Duncan Grant, Pepper
Hamilton LLP, Josy W. Ingersoll, Young,

Conaway, Stargatt & Taylor, Jeffrey S. Goddess,
Rosenthal, Monhait, Gross & Goddess,
Wilmington, DE, for Defendants.

MEMORANDUM ORDER

JORDAN, J.

I. INTRODUCTION

*1 Presently before me are several Motions to
Consolidate filed by plaintiff, Commissariat à I'É
nergie Atomique ("CEA"), in the following patent
infringement cases currently pending in this court:
*CEA v. Dell Computer Corp., et al.,* Civ. No.
03-484-KAJ (D.Del. May 19, 2003) (Docket Item ["
D.I."] 89, D.I. 142); *CEA v. Tottori Sanyo
Electronic Co., Ltd.,* Civ. No. 03-857-KAJ (D.Del.
Sept. 4, 2003) (D.I.10, D.I.27); *CEA v. Best Buy
Co., et al.,* Civ. No. 03-931-KAJ (D.Del. Oct. 6,
2003) (D.I.48, D.I.81); and *CEA v. Fujitsu Ltd.,*
Civ. No. 03-1036-KAJ (D.Del. Nov. 13, 2003)
(D.I.14). Also before me are Motions to Stay the
Case filed by the defendants in Civ. No.
03-484-KAJ (D.I.93); Civ. No. 03-931-KAJ
(D.I.47); and *CEA v. Tatung Co., et al.,* Civ. No.
04-099-KAJ (D.Del. Feb. 13, 2004) (D.I.16). For
the reasons that follow, CEA's Motions to
Consolidate will be granted in part and denied in
part and the defendants' Motions to Stay the Case
will be granted.

II. BACKGROUND

CEA alleges, in all of the cases listed above, that
the defendants are infringing its U.S. Patent No.
4,701,028 ("the '028 patent") and U.S. Patent No.
4,839,412 ("the '412 patent"), which claim certain
liquid crystal display ("LCD") technology. (D.I. 90
at 3.) [FN1] CEA categorizes the defendants by
entity, as follows: module manufacturers, original
equipment manufacturers/distributors ("
OEM/distributors"), and retailers. (D.I. 186 at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1554382 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

11:18-12:17.) In all, CEA has sued over 60 defendants on the same patents. (*Id.* at 15:6-11.) CEA would like the cases against all these defendants consolidated for discovery, pretrial, and trial purposes. (*Id.* at 17:18-18:2.)

> FN1. For ease of reference, and because plaintiffs and defendants essentially make the same arguments in all of their motions, I will cite the docket items associated with *CEA v. Dell Computer Corp., et al.,* Civ. No. 03-484-KAJ, and the transcript from the hearing on the parties' motions (D.I.186), unless otherwise noted. CEA did not file Motions to Consolidate in *CEA v. Tatung Co., et al.* and *CEA v. Sharp Corp., et al.,* Civ. No. 04-231-KAJ (D.Del. Apr. 13, 2004), which also allege infringement of the '028 and '412 patents. CEA also has a patent infringement case against Chi Mei Optoelectronics Corporation pending in the Northern District of California. (D.I. 186 at 9:20-23.)

At the hearing on the parties' motions, the defendants in all of the cases advanced a unified position in response to CEA's Motions to Consolidate. [FN2] (*Id.* at 20:3-12.) The defendants would like the case to go forward against the LCD module manufacturers only, those parties being Samsung Electronics, Fujitsu Display Technologies Corporation, and Tottori Sanyo, and for the case to be stayed against all remaining defendants. (*Id.* at 20:15-21:1; 43:12-18.)

> FN2. From this point forward, any reference herein to "the defendants" means those defendants who were represented at the April 20, 2004 hearing. This does not include the defendants in *CEA v. Tatung Co., et al.* or the defendants in *CEA v. Sharp Corp., et al.* (*See* D.I. 186 at 21:9-19.)

### III. STANDARD OF REVIEW

In general, a district court has broad discretion

when deciding whether to consolidate or stay proceedings. *See* Fed.R.Civ.P. 42(a); *Bechtel Corp. v. Laborers' International Union,* 544 F.2d 1207, 1215 (3d Cir.1976). Federal Rule of Civil Procedure 42 provides that, "[w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." Fed.R.Civ.P. 42(a) (2004).

The power to stay proceedings "is incidental to the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants." *Cheyney State College Faculty v. Hufstedler,* 703 F.2d 732, 738 (quotation omitted). When considering a motion to stay, the court considers the following factors: (1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues and trial of the case; (3) whether discovery is completed; and (4) whether a trial date has been set. *United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991).

### IV. DISCUSSION

#### A. CEA's Motion to Consolidate

**\*2** CEA argues that, because the pending actions involve the same patent, they necessarily have common questions of law and fact, and that this court "routinely grants motions to consolidate when two actions are pending that involve the same or similar patents." (D.I. 90 at 4-5.) CEA also argues that consolidation is appropriate when a single plaintiff has filed multiple actions in the same court ( *id.*), particularly where, as here, the cases involve the same patents, the same infringing products, and the same distribution chain (*id.* at 6).

At the April 20, 2004 hearing, the defendants

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1554382 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

proposed that the case go forward against the LCD module manufacturers, specifically, Samsung Electronics, Fujitsu Display Technologies Corporation, and Tottori Sanyo. (D.I. 186 at 20:15-21:1.) CEA argued that the retailer action, *CEA v. Best Buy Co., et al.,* Civ. No. 03-931-KAJ, should be consolidated with the manufacturer actions, the main reason being that haling the retailers into this court will force the manufacturers to consent to jurisdiction in order to defend their products. (*Id.* at 49:25-50:19.)

Because the defendants did not object to consolidating the cases against Samsung Electronics, Fujitsu Display Technologies Corporation, and Tottori Sanyo at the hearing (*see id.* at 22:2-6), and because the cases involve common questions of law and fact pertaining to infringement of the '028 and '412 patents, those cases will be consolidated for all pretrial and trial purposes, without prejudice to any of the manufacturers filing a motion to sever from the others at trial, once the pretrial matters are concluded. However, I will not consolidate the retailer action with the manufacturer cases. CEA has not come forward with any compelling reason why the case against the retailers should proceed in lockstep with the cases against the manufacturers. Therefore, CEA's Motions to Consolidate will be granted in part and denied in part; they are granted to the extent that they seek to consolidate the Samsung Electronics, Fujitsu Display Technologies Corporation, and Tottori Sanyo module manufacturers, and denied to the extent that they seek to consolidate the remaining defendants.

## B. Defendants' Motions to Stay the Case

Defendants argue that CEA's case against the OEM/distributors and retailers should be stayed pending resolution of the case against the manufacturers. (D.I. 94 at 5; D.I. 186 at 41:23-42:11.) CEA responds that it would be unduly prejudiced and placed at a tactical disadvantage if a stay were granted, and that granting a stay as to the retailers would not simplify the issues in this case. (D.I. 106 at 4-6.) Applying the factors enumerated in *United Sweetener, supra,*

I find that it is appropriate to stay the case against the OEM/distributors and the retailers pending the outcome of the case against the manufacturers.

First, CEA has not articulated, in its papers or at the hearing (*see* D.I. 186 at 25:24-29:4) any real prejudice or tactical disadvantage that it would suffer if the proceedings against the OEM/distributors and retailers are stayed. *See United Sweetner,* 766 F.Supp. at 217. CEA asserts that a stay would "substantially delay" its right to adjudicate its claims against the remaining defendants and that it would be most efficient for the court and the parties "to take discovery and present arguments in this case only one time and not through delayed piecemeal litigation." (D.I. 106 at 5.) Should CEA prevail in this case, it will be compensated for any delay it experiences in recovering damages against the remaining defendants by interest on the award. CEA also argues that, should a preliminary injunction be entered against the manufacturers, [FN3] the injunction would not be broad enough to encompass the retailers if the case against them is stayed. (D.I. 186 at 35:7-36:4.) Such a speculative argument, on its own, does not demonstrate enough prejudice to outweigh the remaining factors in favor of granting a stay. Furthermore, and as explained more fully below, staying the case against the remaining defendants may streamline the case and avoid piecemeal litigation altogether.

FN3. CEA has filed Motions for a Preliminary Injunction in *CEA v. Dell* (D.I.58) and *CEA v. Tottori Sanyo* (D.I.18).

**\*3** Although CEA argues that granting a stay would not simplify the issues pending against the retailers, "[i]t is common practice to stay all pending [patent] litigation except the first suit between the patent owner and a manufacturer or a higher level supplier. " David F. Herr, *Annotated Manual for Complex Litigation,* § 33.63 (3d ed.2003); *see also Katz v. Lear Siegler, Inc.,* 909 F.2d 1459, 1464 (Fed.Cir.1990) ("litigation against or brought by the manufacturer of infringing goods takes precedence over a suit by the patent owner against customers of the manufacturer"). Because the manufacturers are

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2004 WL 1554382 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

intimately involved in the design, operation, and use of the accused LCD panels, they are in the best position to contest the validity and infringement of CEA's asserted patents. Resolving these issues prior to proceeding against the OEM/distributors and retailers would surely simplify this case. If, for example, CEA's patents were found invalid or the manufacturers would found to be not infringing, then there would be no need to proceed against the OEM/distributors or retailers, thus conserving judicial resources and expense to the parties. [FN4]

> FN4. As to the final two *United Sweetener* factors, discovery is not complete in any of the cases, and even though a trial date in October 2005 has been set in *CEA v. Dell,* Civ. No. 03-484-KAJ (*see* D.I. 106 at 3), neither of these factors weigh strongly against granting a stay under the circumstances presented by these cases.

### V. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that CEA's Motions to Consolidate in *CEA v. Dell Computer Corp., et al.,* Civ. No. 03-484-KAJ (D.I.89, D.I.142); *CEA v. Tottori Sanyo Electronic Co., Ltd.,* Civ. No. 03-857-KAJ (D.I.10, D.I.27); and *CEA v. Fujitsu Ltd.,* Civ. No. 03-1036-KAJ (D.I.14) are GRANTED IN PART and DENIED IN PART. They are GRANTED to the extent that they seek to consolidate the cases against Samsung Electronics, Fujitsu Display Technologies Corporation and Tottori Sanyo for pretrial and trial purposes, without prejudice to defendants filing motions to sever once the pretrial matters are completed; and in all other respects, CEA's Motions to Consolidate are DENIED. Counsel should confer on an appropriate simplified case caption for the proceeding against the three named manufacturer defendants. It is further ORDERED that CEA's Motions to Consolidate in *CEA v. Best Buy Co., et al.,* Civ. No. 03-931-KAJ (D.I.48, D.I.81) are DENIED. It is further ORDERED that defendants' Motions to Stay the Case in Civ. No. 03-484-KAJ (D.I.93); Civ. No. 03-931-KAJ (D.I.47); and Civ. No. 04-099-KAJ (D.I.16) are GRANTED to the extent that they seek to stay the proceedings against

the OEM/distributors and retailers.

D.Del.,2004.
Commissariat A L'Energie Atomique v. Tottori Sanyo Electronic Co., Ltd.
Not Reported in F.Supp.2d, 2004 WL 1554382 (D.Del.)

Briefs and Other Related Documents (Back to top)

- 1:04CV00582 (Docket) (Jun. 25, 2004)
- 1:04cv00099 (Docket) (Feb. 13, 2004)
- 1:03cv01036 (Docket) (Nov. 13, 2003)
- 1:03cv00857 (Docket) (Sep. 04, 2003)
- 1:03cv00484 (Docket) (May. 19, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy

Slip Copy, 2005 WL 2012071 (E.D.Pa.)
(Cite as: Slip Copy)

Page 1

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
DAVLYN MANUFACTURING CO., INC.,
Plaintiff,
v.
H & M AUTO PARTS, INC., d/b/a H & M
Company Incorporated, Henry C. Hight, Jr., and
Tape & Technologies Incorporated, Defendants.
**No. Civ.A. 04-5516.**

Aug. 18, 2005.

Gary Allen Rosen, Patrick Madamba, Jr., Law
Offices of Gary A. Rosen, PC, Philadelphia, PA, for
Plaintiff.
Richard M. Jordan, White and Williams, for
Defendant.

MEMORANDUM AND ORDER

JOYNER, J.
*1 Via the instant motion, Defendants Tape &
Technologies, Incorporated and Henry C. Hight, Jr.
seek, once again, to dismiss this patent infringement
action for lack of personal jurisdiction. For the
reasons that follow, Defendants' motion shall be
granted and this action shall be dismissed with
respect to the moving Defendants only.

*Facts*

Plaintiff Davlyn Manufacturing Co., Inc. ("Davlyn"
), a Pennsylvania corporation, is the assignee of
three patents describing oven door gaskets used to
seal the heat within conventional home ovens.
Plaintiff filed the instant patent infringement action
against Defendant H & M Auto Parts, Inc. ("H & M
") on November 29, 2004, alleging that H & M's
sale of oven door gaskets and clips to Electrolux
Home Products ("Electrolux/Frigidaire"), the maker

of Frigidaire brand appliances, infringed upon
Plaintiff's patents. Plaintiff amended its Complaint
on December 21, 2004, joining Defendants Tape &
Technologies, Incorporated ("T & T") and Henry
C. Hight, Jr ("Hight Jr.").

Defendant H & M is a Texas corporation
headquartered in San Antonio, with additional
offices in El Paso and Helotes. (Flack Depo., pp.
45, 47-50). H & M does business in Pennsylvania
and does not contest this Court's jurisdiction.
(Flack Depo., pp. 91-93). H & M was established in
1957 by Henry Hight, Sr. ("Hight Sr."), who is a
current 60% shareholder. (Hight Aff. ¶ 4). The
remaining seven shareholders, who all hold
positions as officers and directors, are Hight Sr.'s
children: Defendant Henry C. Hight, Jr., Robert
Hight, Stephen Hight, Susannah Herman, Hallie
Rowe, Joe Hight, and Nancy Flack. (Flack Depo.,
pp. 10-11; Pl. Exh. D; Hight Aff. ¶ 4).

During the time that they were employed at H & M,
Defendant Hight Jr., a Vice President of H & M,
and his wife, Sylvia Hight, a sales employee,
developed an oven gasket for use in home ovens.
(Flack Depo., pp. 65-67; Hight Aff. ¶ 11). In 2003,
they arranged for a Chinese vendor to manufacture
the allegedly infringing oven gaskets, and Hight Jr.
made two sales on behalf of H & M. (Flack Depo.,
pp. 31-32, 64-65). In June of 2003, 11,000 gaskets
were shipped to Electrolux/Frigidaire. (*Id.* at pp. 65,
82-84; Pl. Exh. O). In August of 2003, 3,000
gaskets were shipped to G.E. Roper Corporation ("
GE"), the maker of General Electric brand
appliances. (Flack Depo., pp. 65, 82-84; Pl. Exh. O).

Defendant H & M contends that, at some point prior
to October 2003, Hight Sr. decided to discontinue
the sale of oven gaskets, and instructed Hight Jr.
and Sylvia Hight not to make any further sales or
purchases of gaskets on behalf of H & M. (Flack
Depo., pp. 30-37, 106-107, 114-115). Hight Sr. also
allegedly told Hight Jr. and Sylvia Hight that "he
wouldn't like" it if they purchased the gaskets on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2

Slip Copy, 2005 WL 2012071 (E.D.Pa.)
**(Cite as: Slip Copy)**

their own, independently of H & M. (*Id.* at p. 34). Nevertheless, Hight Jr. and Sylvia Hight made additional, allegedly unauthorized, purchases under the H & M name, and as well as at least one additional sale to Electrolux/Frigidaire, which was invoiced on December 19, 2003. (*Id.* at pp. 31-32, 74-78, 95; Pl. Exhs. P, R). H & M became aware of some of these purchases because the shipping and billing address used was that of H & M's Helotes office, where Hight Jr. and Sylvia Hight are headquartered. (Flack Depo., pp. 32-33; Pl. Exhs. P, R).

*2 On January 16, 2004, H & M was notified by a letter from Plaintiff's counsel that its sale of oven gaskets potentially infringed upon Davlyn's patents. (Pl.Exh. Q). H & M did not respond to Plaintiff's correspondence until April 12, 2004, when Nancy Flack, President of H & M, wrote, "We understand that there are patent issues. After the receipt of your letter we discontinued all sales to Frigidaire on this item." (Pl.Exh. V).

Shortly after H & M's receipt of the January 16, 2004 letter from Plaintiff's counsel, Sylvia Hight sent the following e-mail from her H & M e-mail account to the Chinese manufacturer regarding a purchase order that had been placed on January 16, 2004: "We have been having many issues here regarding the patent and the potential lawsuit ... I'll need to forward the P.O. But because of the potential suit. I need to write and wire it another way ... I'll wire the money but I think I need to send it by another company name." (Pl.Exh. R). A subsequent email from Sylvia noted, "The company name that we are going to use is 'H M Tape & Technologies Company." (Pl.Exh. R). Thereafter, a purchase order dated January 30, 2004 was issued by "H M Tape & Technologies" for 50,000 units from the Chinese manufacturer, for shipment to "H & M Tape & Technologies" at the address of H & M's Helotes office. (Pl.Exh. S).

Hight Jr. incorporated HM Tape & Technologies Incorporated on February 4, 2004, and formally changed the company's name to Tape & Technologies Incorporated on April 5, 2004. (Pl.Exhs.F, G). The business address of T & T's registered agent, Hight Jr., is the same address as H

& M's Helotes office. (Pl.Exh. G).

*Procedural History*

Davlyn filed its Complaint against H & M on November 29, 2004 before the United States District Court for the Eastern District of Pennsylvania, unaware that the allegedly infringing gaskets were being sold by any other company. Defendant H & M was served with the Complaint on December 9, 2004, and Defendant Hight Jr. was notified of the suit at some point prior to December 13, 2004. (Flack Depo., pp. 91-93). Plaintiff first learned that another company was involved in the sale of the gaskets on December 21, 2004, by the following correspondence from H & M's counsel: " H & M made one small sale of the accused product to both Frigidaire and GE. However, once they received the cease and desist letter from your client, they made no further sales ... I have a copy of an email from Louise Wang at Electrolux (Frigidaire) stating, 'this is to confirm that Tape & Technology was the supplier who was selling us the fiberglass door seal from Feb.04 to Oct.04." ' (Pl.Exh. Z). Upon receiving notice of T & T's involvement, Davlyn amended its Complaint on December 21, 2004, adding T & T and Hight Jr. as defendants. On January 5, 2005, Davlyn was served with a complaint in a declaratory judgment action that had been filed by T & T in the United States District Court for the Western District of Texas on December 16, 2004.

*3 On January 10, 2005, Defendants T & T and Hight Jr. moved to dismiss this action for lack of personal jurisdiction, or in the alternative, to transfer the action to the United States District Court for the Western District of Texas. This Court denied the Motion without prejudice, and granted 60 days leave to conduct jurisdictional discovery.

On January 31, 2005, Plaintiff Davlyn moved before the United States District Court for the Western District of Texas to dismiss the action pending there, or in the alternative, to transfer venue to the Eastern District of Pennsylvania. Upon consideration of the record, the court found that T & T and Hight knew of the pending suit against H

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2012071 (E.D.Pa.)
**(Cite as: Slip Copy)**

& M in the Eastern District and "clearly filed [the declaratory judgment action] in anticipation of litigation." *Tape & Technologies v. Davlyn Manufacturing Co., Inc.,* 2005 U.S. Dist LEXIS 8291 at 8, 2005 WL 1072169 at 3 (W.D.Tx.2005). While recognizing that the evidence "weigh [ed] against the exercise of the Court's discretion to hear the declaratory judgment action," the court denied the motion to dismiss only because "there exists some question as to whether the Eastern District of Pennsylvania would be able to exercise personal jurisdiction over Plaintiff." *Tape & Technologies,* 2005 U.S. Dist LEXIS 8291 at 10, 2005 WL 1072169 at 4.

Before this Court, Defendants T & T and Hight Jr. now renew their motion to dismiss or, in the alternative, to transfer.

*Standard of Review: Personal Jurisdiction*

Questions of personal jurisdiction in patent actions are governed by Federal Circuit law, rather than that of the regional circuit in which the actions arise. *Akro Corp. v. Luker,* 45 F.3d 1541, 1543 (Fed.Cir.1995).

In order to establish personal jurisdiction in a patent infringement action over a non-resident defendant, a plaintiff must show both that jurisdiction exists under the forum state's long-arm statute, and that the exercise of jurisdiction would be consistent with the requirements of due process. *Commissariat a l'Energie Atomigue v. Chi Mei Optoelectronics Corp.,* 395 F.3d 1315, 1319 (Fed.Cir.2005). Of course, Pennsylvania's long-arm statute is coextensive with the limits of due process, extending jurisdiction to the "fullest extent allowed under the Constitution of the United States." *Resnick v. Manfredy,* 52 F.Supp.2d 462, 466 (E.D.Pa.1999).

In order to be subject to personal jurisdiction, due process requires that a non-resident defendant have certain "minimum contacts" with the forum state " such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *LSI Indus. v. Hubbell Lighting,*

*Inc.,* 232 F.3d 1369, 1375 (Fed.Cir.2000) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). The minimum contacts requirement helps ensure that non-residents have fair warning that a particular activity may subject them to litigation within the forum state. *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1565 (Fed.Cir.1994) (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

*4 Under the "minimum contacts" test, a defendant may be subject to personal jurisdiction under one of two theories. Where the defendant has maintained continuous and systematic contacts with the forum state, he will be subject to "general jurisdiction"; where, instead, the plaintiff's cause of action arises from the defendant's more limited forum-related activities, he may be subject to "specific jurisdiction. " *LSI Indus.,* 232 F.3d at 1374-75 (citing *Burger King Corp.,* 471 U.S. at 472-73; *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414-16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) ).

The Federal Circuit has established a three-prong test for determining whether the exercise of specific jurisdiction is consistent with due process. Specific jurisdiction properly exists where: (1) the defendant "purposefully directed" its activities at residents of the forum state; (2) the claim arises out of or relates to those activities; and (3) the exercise of personal jurisdiction would be reasonable and fair. *3D Sys. v. Aarotech Lab.,* 160 F.3d 1373, 1378 (Fed.Cir.1998) (citing *Akro Corp.,* 45 F.3d at 1545-46). While the plaintiff bears the burden of establishing purposeful minimum contacts, upon this showing, defendants must prove that the exercise of jurisdiction is unreasonable. *Elecs. for Imaging, Inc. v. Coyle,* 340 F.3d 1344, 1350 (Fed.Cir.2003) (citing *Inamed Corp. v. Kuzmak,* 294 F.3d 1356, 1360 (Fed.Cir.2001)). In deciding a motion to dismiss for lack of personal jurisdiction, the Court need not treat the plaintiff's allegations as true, but may consider affidavits and weigh any other relevant evidence in making the jurisdictional determination. *Atlantigas Corp. v. Nisource, Inc.,* 290 F.Supp.2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2012071 (E.D.Pa.)
**(Cite as: Slip Copy)**

34, 42 (D.D.C.2003).

*Discussion*

I. Specific Jurisdiction Under the Stream of
Commerce Theory

Defendants T & T and Hight Jr. maintain that this
action must be dismissed for lack of personal
jurisdiction because neither T & T nor Hight Jr.
purposefully directed the sale of allegedly
infringing oven gaskets at the forum state of
Pennsylvania.

Defendant T & T is a Texas corporation with no
offices, employees, agents, or customers in
Pennsylvania. (Hight Aff. ¶ 4, 8, 13). T & T's
president, Defendant Hight Jr., is a Texas resident
with no Pennsylvania business contacts. (*Id.* at ¶ 3,
14). T & T denies having ever sold, offered for sale,
distributed, or advertised its products within
Pennsylvania. (*Id.* at ¶ 13). Since its incorporation
in February of 2004, T & T has sold oven gaskets
and clips to only one customer,
Electrolux/Frigidaire, located in Springfield,
Tennessee. (*Id.* at ¶ 5).

Plaintiff, however, maintains that Defendants T & T
and Hight Jr. purposefully directed their activities at
the forum state of Pennsylvania by placing oven
gaskets and clips in the stream of commerce via a
nationwide distributor of home appliances.
Electrolux/Frigidaire makes "Frigidaire" brand
appliances, as well as residential ovens for Sears' "
Kenmore" brand. (Flasher Aff. ¶ 4). Frigidaire and
Kenmore brand products are sold through
established channels of distribution throughout the
United States, including in Pennsylvania. (*Id.* at ¶
4). Electrolux/Frigidaire's website, for example,
identifies 20 authorized retailers selling Frigidaire
ovens in Pennsylvania within a 50 mile radius of
Philadelphia, as well as seven authorized Frigidaire
service providers in the same region through which
replacement gaskets may be purchased. (Pl.Exh.
CC). It is common knowledge that Frigidaire and
Kenmore brand appliances, including residential
ovens, are widely available for sale throughout

Pennsylvania. Gary Flasher, a project manager at
Davlyn, was able to locate without difficulty at least
two Frigidaire ovens being offered for sale locally
which incorporated clip gaskets "of the exact style,
materials, and other characteristics as the Accused
Product." (Flasher Aff., ¶ 6-8). While T & T
admits that Electrolux/Frigidaire is a manufacturer
and distributor of ovens, and that
Electrolux/Frigidaire incorporates T & T's gaskets
and clips into ovens intended for sale, it asserts that
"T & T has no control, nor knowledge except in a
general sense, of the oven gaskets and clips' final
destination." (Hight Aff. ¶ 9).

**\*5** The Supreme Court in *World-Wide Volkswagen
Corp. v. Woodson,* 444 U.S. 286 (1980) first
addressed the question of whether constitutionally
sufficient minimum contacts are satisfied where a
defendant places a product in the "stream of
commerce." The Court found that, where the sale of
a product is not simply an isolated occurrence, but
arises from the seller's attempts "to serve, directly
or indirectly, the market for its product in other
states," it is not unreasonable for a court to find that
the seller has purposefully availed himself of the
privilege of doing business in the forum state.
*World-Wide Volkswagen Corp.,* 444 U.S. at 297.
Thus, personal jurisdiction may properly be
exercised over a corporation "that delivers its
products into the stream of commerce with the
expectation that they will be purchased by
consumers in the forum State." *World-Wide
Volkswagen Corp.,* 444 U.S. at 297-298. The Court
did not, however, specify the degree of actual
interaction that a seller must have with the forum
state to demonstrate his intent or expectations with
respect to serving a broader market.

In *Asahi Metal Industry Co. v. Superior Court of
California,* 480 U.S. 102, 107 S.Ct. 1026, 94
L.Ed.2d 92 (1987), the Supreme Court was evenly
divided as to what would constitute sufficient
minimum contacts under a stream of commerce
theory. Justice O'Connor, writing for four members
of the Court, found that the mere placement of a
product into the stream of commerce, without more,
does not demonstrate that a defendant "purposefully
directed" his activities toward the forum state.
*Asahi Metal Industry Co.,* 480 U.S. at 112. Justice

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 5

Slip Copy, 2005 WL 2012071 (E.D.Pa.)
**(Cite as: Slip Copy)**

O'Connor proposed that, even if the defendant is aware that his product may be swept into the forum state, some additional evidence of purpose or intent must be found-for example, "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. " *Asahi Metal Industry Co.,* 480 U.S. at 112. Justice Brennan and three others instead suggested that evidence of such "additional conduct" is not necessary for a finding of constitutionally sufficient minimum contacts. "The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Asahi Metal Industry Co. .,* 480 U.S. at 117. While maintaining the requirement that a defendant purposefully avail himself of business in the forum state, Justice Brennan found Justice O'Connor's "stream of commerce-plus" approach to be a "marked retreat" from the standard set forth in *World-Wide Volkswagen. Asahi Metal Industry Co.,* 480 U.S. at 118-120.

*6 In light of the conflicting positions set forth in *Asahi,* the Federal Circuit has declined to adopt a position as to whether mere placement of a product in the stream of commerce and awareness of its potential destination will subject a defendant to jurisdiction in a forum state. [FN1] *Commissariat a l'Energie Atomique,* 395 F.3d at 1322 n. 7; *see also Beverly Hills Fan Co.,* 21 F.3d at 1566. In all the relevant cases addressed by the Federal Circuit to date, the defendants' contacts with the forum state have been sufficient to satisfy even the more stringent test set forth by Justice O'Connor in *Asahi.* In *Beverly Hills Fan Co.,* for example, the defendant, a ceiling fan manufacturer, shipped its fans directly to the forum state of Virginia for sale by a distributor with several retail outlets in Virginia. The fans ultimately sold in Virginia clearly identified the defendant as the source of the product, and were accompanied by a warranty that the defendant would honor. The court concluded

that the defendant manufacturer's "conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there." *Beverly Hills Fan Co.,* 21 F.3d at 1566. Likewise, in *Viam Corp. v. Iowa Export-Import Trading Co.,* 84 F.3d 424 (Fed.Cir.1996), a foreign defendant entered into an exclusive marketing and distribution agreement with an Iowa corporation that distributed its product throughout the United States and in the forum state of California. Beyond simply placing its product into the stream of commerce, the foreign corporation "knowingly and intentionally exploited the California market through its exclusive distributor's advertising in California, and by establishing channels for providing regular advice in California." *Viam Corp.,* 84 F.3d at 428-29.

> FN1. Although this Court is obligated to apply Federal Circuit law in this patent infringement action, we note that the Third Circuit has likewise declined to adopt a position with respect to this issue. *See Pennzoil Prods. Co. v. Colelli & Assocs.,* 149 F.3d 197, 207 n. 13 (3rd Cir.1998); *Renner v. Lanard Toys,* 33 F.3d 277, 283 (3rd Cir.1994); *but see Portella v. Life-Time Truck Prods., Inc.,* 127 F.Supp.2d 652, 658-59 (E.D.Pa.2000) (adopting Justice O'Connor's approach as the "best-reasoned" and most likely to be adopted by the current Supreme Court).

In the instant case, Plaintiff has presented no evidence of additional conduct or contacts which would indicate that T & T purposefully directed its activities at the forum state of Pennsylvania. While T & T admits to a "general" awareness that its oven gaskets may be incorporated into ovens sold in various states, including Pennsylvania, it has no control over whether the gaskets end up in Pennsylvania as opposed to any other state, and has taken no purposeful steps to ensure that it reaps the benefits of Pennsylvania business. T & T does not ship its products to Pennsylvania. Unlike the defendant in *Viam Corp.,* T & T has no exclusive distribution agreement with Electrolux/Frigidaire, and T & T is by no means the only company that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 6

Slip Copy, 2005 WL 2012071 (E.D.Pa.)
**(Cite as: Slip Copy)**

sells oven gaskets for incorporation into Frigidaire ovens. Electrolux/Frigidaire does not market or advertise T & T's oven gaskets, let alone identify them by name, as in *Beverly Hills Fan Co.,* given that each gasket is merely one minor component of a larger and independently functional product, the home oven. Plaintiff has offered no evidence to suggest that consumers purchasing Frigidaire ovens are aware that the oven's heat-sealing gaskets were originally sold by a Texas corporation. T & T does not provide consumers, either directly or indirectly, with a warranty for its products. Even if the purchaser of a Frigidaire oven were to contact an authorized Frigidaire service provider in Pennsylvania for a replacement gasket, there is no evidence that T & T would be involved in the replacement process in any way. In sum, T & T has neither designed its product to target the needs of Pennsylvania consumers, nor established channels for providing regular advice to Pennsylvania customers, nor marketed its product to consumers either directly, or indirectly, through a distributor or sales agent. *See Asahi Metal Industry Co.,* 480 U.S. at 112. Thus, T & T's contacts with the forum state of Pennsylvania are clearly inadequate to satisfy Justice O'Connor's test of "stream of commerce-plus. " It is arguable, however, that T & T's placement of oven gaskets into the nationwide stream of commerce, combined with its general awareness of their final destination, might be sufficient to satisfy Justice Brennan's less exacting standard for minimum contacts.

*7 Despite the absence of clear guidance from either the Federal or Third Circuits, this Court must take a position with respect to the resolution of the instant action. Accordingly, we find that a defendant does not "purposefully direct" its activities at a forum state merely by selling a component part to a nationwide distributor of home appliances with the awareness that appliances containing the defendant's product may ultimately be sold in the forum state. In keeping with the stream of commerce theory proposed by Justice O'Connor in *Asahi,* there must be some additional evidence of the defendant's purpose and intent to serve the forum state, such as state-specific marketing or design, the provision of customer support services, or an exclusive contractual relationship with a

distributor in the forum state. The Supreme Court has held that "foreseeability alone" is not a sufficient benchmark for personal jurisdiction under the Due Process Clause, and we believe that adoption of the broad minimum contacts test enunciated by Justice Brennan in *Asahi* would run afoul of this prescription. *World-Wide Volkswagen Corp.,* 444 U.S. at 295; *see Portella v. Life-Time Truck Prods., Inc.,* 127 F.Supp.2d 652, 658-59 (E.D.Pa.2000).

As this Court's jurisdiction over Defendants T & T and Hight Jr. would be grounded on the mere foreseeability that T & T's oven gaskets might be incorporated into products ultimately sold in Pennsylvania, we decline to exercise it. Absent some other justification for the exercise of personal jurisdiction, this Court must dismiss the claims raised by Plaintiff against Defendants T & T and Hight Jr.

II. Jurisdiction Under the Alter Ego or Successor Theories

Plaintiff contends that, even if Defendants T & T and Hight Jr. themselves had insufficient contacts with the forum state of Pennsylvania to satisfy the requirements of due process, this Court should nonetheless exercise jurisdiction because these Defendants are the alter egos or successors of H & M, a corporation with substantial and ongoing Pennsylvania contacts.

Where an individual or a corporation has insufficient contacts with the forum state to satisfy due process, a court may nonetheless exercise personal jurisdiction if the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction before that court. *Minn. Mining & Mfg. Co. v. Eco Chem,* 757 F.2d 1256, 1265 (Fed.Cir.1985) (citing *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt., Inc.,* 519 F.2d 634 (8th Cir.1975)). The alter ego and successor doctrines are closely related, and look to whether the later-formed entity is a mere continuation of its predecessor, as well as whether there are any indicia of fraud, illegality, or injustice. *See generally, Material Supply Int'l, Inc. v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2012071 (E.D.Pa.)
**(Cite as: Slip Copy)**

*Sunmatch Indus. Co.,* 62 F.Supp.2d 13, 19-20 (D.D.C.1999); *Richard v. Bell Atl. Corp.,* 946 F.Supp. 54, 61 (D.D.C.1996). In making these determinations, the court should consider the nature of the corporate entities' ownership and control, including commonality of stockholders or officers; common use of employees, business locations, or sales systems; common marketing or trademarking; similarity of core business lines; and commingling of funds and assets. *See Lucas v. Gulf & Western Industries, Inc.,* 666 F.2d 800, 805-806 (3rd Cir.1981); *Gammino v. SBC Communs., Inc.,* 2005 U.S. Dist. LEXIS 5077 at 11-12 (E.D.Pa.2005); *Material Supply Int'l, Inc.,* 62 F.Supp.2d at 19-20. The court should also consider the sufficiency of consideration paid for the transfer of the predecessor's assets or product line, as well as any other indicia of fraudulent intent in the creation of the second entity. *Material Supply Int'l, Inc.,* 62 F.Supp.2d at 19-20; *Valley Finance v. United States,* 629 F.2d 162, 172 (D.C.Cir.1980).

**\*8** In this action, Plaintiff has failed to show to this Court's satisfaction that Defendants T & T and Hight Jr. are true successors or alter egos of Defendant H & M. This Court does recognize that Defendant Hight Jr. is an officer, shareholder, and employee of both T & T and H & M, and that T & T's headquarters are located at the same address as one of H & M's offices. This Court further recognizes that Hight Jr., as T & T's agent, is currently in the business of selling the same allegedly infringing oven gaskets he once sold as an agent of H & M, and to at least one of the same customers. However, the jurisdictional discovery that has been conducted since this Court's last order reveals a credible explanation of why T & T and Hight Jr. should not be considered successors or alter egos of H & M.

Hight Jr. owns only 5.6% of H & M's stock and does not participate significantly in the management, control, or day-to-day business decisions of H & M. (Flack Depo., pp. 112, 121; Hight Aff. ¶ 4). H & M and Hight Jr. both maintain that there is no corporate relationship whatsoever between H & M and T & T. (*Id.* at pp. 105-106; Hight Aff. ¶ 6). Nancy Flack, the president of H & M, avers that Hight Jr.'s 2004

creation of T & T resulted from a family rift concerning H & M's business line that occurred as early as October of 2003, at least three months before H & M was notified of a potential patent dispute. (*Id.* at pp. 30-37). H & M contends that the allegedly infringing gasket was designed by Hight Jr. and Sylvia Hight, and that H & M authorized Hight Jr. to make only two sales of sample gaskets on its behalf in 2003. (*Id.* at pp. 65-67, 82-84). Hight Sr. then determined that he was not interested in pursuing the oven gasket product line, and allegedly instructed Hight Jr. to stop purchasing and selling the gaskets on behalf of H & M. (*Id.* at pp. 33-37, 106-107, 114-115). H & M maintains that any invoices for gaskets issued after October 2003 were not authorized by H & M. (*Id.* at pp. 31-32, 74-78, 95). Furthermore, H & M makes no claims with respect to any patent rights for the product developed by Hight Jr. (*Id.* at pp. 108-109; Hight Aff. ¶ 11).

Plaintiff asserts that T & T was created for the purpose of shielding H & M from patent litigation. However, every allegedly incriminating fact identified by Plaintiff is adequately rebutted by Nancy Flack's description of the events at issue. While Plaintiff contends that the timing of T & T's formation suggests an attempt to shield H & M from liability, this Court finds credible Nancy Flack's description of the October 2003 conflict between Hight Jr. and Hight Sr. with respect to H & M's sale of oven gaskets. And while Sylvia Hight's e-mails to the Chinese manufacturer may suggest an attempt by T & T to avoid liability for patent infringement, Plaintiff has offered no evidence beyond Sylvia Hight's use of an H & M e-mail address to suggest that H & M in any way authorized, or was even aware of, this course of action. Plaintiff also makes much of the fact that no consideration was paid by T & T to H & M for its gasket business, and that Hight Jr.'s gasket sales continued "seamlessly" through the transition from H & M to T & T. However, as H & M admits that Hight Jr. and Sylvia Hight developed the gaskets, and now denies having any claim to the product's patent rights, the course of events highlighted by Plaintiff seems less troubling. If Hight Jr. and Sylvia Hight initially introduced their gaskets as a potential H & M product line, and were informed that H & M was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2012071 (E.D.Pa.)
**(Cite as: Slip Copy)**

not interested in pursuing this line of business, it should come as no surprise that Hight Jr. would subsequently decide to sell his product through a corporation of his own creation. If H & M has no rights to the product at issue, it is likewise logical than no consideration would be paid for the transfer of H & M's "interest" in the product. Plaintiff's final piece of evidence suggesting a link between H & M and T & T is that Hight Sr. provided T & T with a $25,000 start-up loan. However, Plaintiff has offered nothing to suggest that this $25,000 was anything other than a legitimate family loan from a successful father to a son who is starting his own business. Moreover, Hight Jr. also contributed over $150,000 of his own money towards the formation of T & T, $65,960 of which was deposited in late 2003, long before H & M even knew of the possibility of a patent infringement action by Davlyn. (Pl.Exh. I).

*9 The justification for imposing alter ego or successor jurisdiction is to prevent corporations from escaping liability by hiding behind sham entities. While the facts highlighted by Plaintiff tend to suggest that Hight Jr. was aware of the pending patent dispute when he incorporated T & T, Plaintiff has failed to set forth sufficient evidence demonstrating that H & M authorized or anticipated the creation of T & T, or had any expectation that T & T's formation would help H & M escape liability. In fact, the testimony of H & M's representative, Nancy Flack, indicates that Hight Sr., who owns 60% of H & M's stock, instructed Hight Jr. in October of 2003 not to make any additional purchases or sales of oven gaskets, either on H & M's behalf or on Hight Jr.'s own behalf. (Flack Depo., p. 34; Hight Aff. ¶ 4). Thus, Plaintiff's assertion that T & T was created for the purpose of shielding H & M from jurisdiction or liability is grounded in little more than speculation. This Court finds that Plaintiff has failed to meet its burden of demonstrating that personal jurisdiction over Defendants would be proper under a theory of alter ego or successor liability.

### III. Defendants' Motion in the Alternative to Transfer

As this Court finds that it cannot exercise jurisdiction over Defendants T & T and Hight Jr. consistent with the requirements of due process, the claims against them must be dismissed, and Defendants' motion in the alternative to transfer this case to the Western District of Texas is moot. Plaintiff's action against Defendant H & M may proceed before this Court, and Plaintiff is free to pursue its claims against Defendants T & T and Hight Jr. in a more appropriate forum.

An appropriate Order follows.

### ORDER

AND NOW, this 18th day of August, 2005, upon consideration of the Renewed Motion to Dismiss, Or, In the Alternative, to Transfer of Defendants Tape & Technologies Incorporated and Henry C. Hight, Jr. (Doc. No. 35) and all responses thereto (Docs. No. 36, 37, 38), it is hereby ORDERED that the Motion is GRANTED. It is FURTHER ORDERED that this matter is DISMISSED as to Defendants Tape & Technologies Incorporated and Henry C. Hight, Jr. only.

E.D.Pa.,2005.
Davlyn Mfg. Co., Inc. v. H & M Auto Parts, Inc.
Slip Copy, 2005 WL 2012071 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2684486 (Trial Motion, Memorandum and Affidavit) Defendants, Tape & Technologies Incorporated and Henry C. Hight, Jr.'s, Supplemental Memorandum of Law in Support of their Motions to Dismiss Or, in the Alternative, to Transfer, and Defendants' Response to Plaintiff'S Opposition to Same (Aug. 12, 2005)
• 2:04cv05516 (Docket) (Nov. 29, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.