Westlaw.

Not Reported in F.Supp.                                                                      Page 1

Not Reported in F.Supp., 1996 WL 296540 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

▷
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Charles JORDAN, Support Securities Ltd., Denis E.
Chambers, and Michael J.W. Sellers, Plaintiffs,
v.
SEI CORPORATION, and Alfred P. West, Jr.,
Defendants.
**No. CIV. A. 96-1616.**

June 4, 1996.

MEMORANDUM AND ORDER

YOHN, J.
*1 Plaintiffs Charles Jordan ("Jordan"), Support
Securities Limited ("SSL"), Denis E. Chambers ("
Chambers") and Michael J.W. Sellers ("Sellers")
brought an action for common law fraud and
negligent misrepresentation against defendants SEI
Corporation ("SEI") and Alfred P. West, Jr. ("West"
). Defendants immediately countered by filing a
motion to dismiss, claiming that Zurich, Switzerland
is the proper forum for this lawsuit. Defendants
base their argument on a contractual forum
selection clause or, alternatively, the doctrine of
*forum non conveniens*. Finding that the forum
selection clause is both enforceable and applicable
to this case, the court will dismiss plaintiffs' action
without prejudice. [FN1]

>      FN1. Defendants brought their motion to
>      dismiss under Federal Rules of Civil
>      Procedure 12(b)(1), (3) and (6). Rule
>      12(b)(1) authorizes dismissal for lack of
>      subject matter jurisdiction and, therefore,
>      is not appropriate here. The court has
>      subject matter jurisdiction over this
>      diversity action pursuant to 28 U.S.C. §

*STANDARD: RULE 12(b)(6)*

When considering a motion to dismiss pursuant to
Federal Rule of Civil Procedure 12(b)(6), the court
must accept as true and view in a light most
favorable to the plaintiff all allegations made in the
complaint. *H.J. Inc. v. Northwestern Bell
Telephone Co.*, 492 U.S. 229, 249 (1989); *Rocks v.
City of Philadelphia*, 868 F.2d 644, 645 (3d
Cir.1989). A motion to dismiss will only be
granted if it is clear that relief cannot be granted to
the plaintiff under any set of facts that could be
proven consistent with the complaint's allegations.
*Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

Generally, in deciding a motion to dismiss, a district
court considers only the allegations of the
complaint, exhibits attached to the complaint and
matters of public record. *Pension Benefit Guar.
Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192,
1196 (3d Cir.1993), *cert. denied*, 114 S.Ct. 687
(1994). However, a district court also may
consider "an undisputedly authentic document that a
defendant attaches as an exhibit to a motion to
dismiss if the plaintiff's claims are based on the
document." *Id.* A district court may consider such a
document without having to convert the motion to
one for summary judgment. [FN2] *Id.* Defendants
attached two letter agreements to their motion to
dismiss, one between Jordan and SEI Capital AG ("
AG") and one between Chambers and Sellers, and
AG. These contracts contain the forum selection
clauses at issue in defendants' motion. Plaintiffs do
not contest the authenticity of these documents.
Additionally, the court finds that plaintiffs' claims
are based on these agreements because their claims
derive primarily from their relationship with AG
and its agents, which the agreements governed.
Accordingly, the court will consider the letter
agreements along with the complaint in deciding
defendants' motion to dismiss.

>      FN2. The Third Circuit explained as
>      follows:
>      Our decision will not undermine the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 2

Not Reported in F.Supp., 1996 WL 296540 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

rationale underlying Rule 12(b)(6)'s requirement that a motion to dismiss be converted to a summary judgment motion if a court considers matters outside the pleadings. The reason that a court must convert a motion to dismiss to a summary judgment motion if it considers extraneous evidence submitted by the defense is to afford plaintiff an opportunity to respond. When a complaint relies on a document, however, the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished.
*White Consol. Indus., Inc.,* 998 F.2d at 1196-97 (citations omitted).

*BACKGROUND:*

1. The Complaint

Plaintiffs' complaint alleges the following facts. [FN3]

FN3. Throughout the complaint, plaintiffs use inconsistent terminology to refer to the various actors, often attributing to SEI acts that appear to have been committed by AG or individual agents of AG. Although confusing at times, the court's recital of the facts remains true to plaintiffs' presentation in the complaint.

Plaintiffs are all subjects of the United Kingdom ("U.K."). Jordan resides in Scotland. SSL is registered in Scotland and maintains places of business in Edinburgh and London. Chambers and Sellers both reside in Great Britain. Defendant SEI is a Pennsylvania corporation and defendant West, Chairman and Chief Executive Officer of SEI, resides in Pennsylvania. (Compl. at ¶¶ 4-9.)

*2 In 1994, SEI created AG, a wholly owned Zurich-based subsidiary. Peter Dahl ("Dahl"), a Swedish subject, was AG's president. SEI conducted business in the U.K. through AG. AG offered investors "entry into a trading partnership that purchase[d] fixed income instruments in the European private placement and trade finance debt markets." The partnership operated as follows. Investors would deposit funds in a Swiss banking institution earning normal short term interest. AG would arrange trades on behalf of these investors, using the deposited capital. The trades would generate profits from pricing differentials caused by market inefficiencies. AG then would split the profit earned from each trade with the investors. (Compl. at ¶ 10.)

A. Jordan and SSL

Jordan first made Dahl's acquaintance on April 12, 1994. In May of 1994, Jordan met with Dahl in Zurich and learned about the trading in which SEI was to engage. Dahl told Jordan that the trading would be riskless. Dahl then asked Jordan to arrange meetings at which Dahl could pitch SEI's investment products to Scottish investors. Jordan agreed to become a marketing representative for SEI in the U.K.. In exchange, Dahl agreed to compensate Jordan with a percentage of the monies invested in SEI as a result of his efforts. (Compl. at ¶¶ 11-12.)

Jordan began to actively solicit interest in SEI among investors in Edinburgh. Echoing Dahl, Jordan told potential investors that investment in SEI would be riskless. On May 23, Jordan wrote to defendant West and told him that he had set up three meetings with potential clients. On June 9, 1994, Dahl and West gave three separate presentations to Scottish investors, in which they stressed that investment with SEI would be riskless. In early August of 1994, Jordan and a prospective client met with Dahl in Zurich and, again, Dahl described SEI's planned trades as riskless. On September 1, 1994, a prospective client recruited by Jordan contacted Dahl with questions about the proposed trading program. On September, 5, 1994, SEI responded to those questions through an individual named Stefan de Bekassy ("de Bekassy"). (Compl. at ¶¶ 13-15, 17.)

Jordan intensified his efforts to secure clients for SEI based on the following misrepresentations:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 3

Not Reported in F.Supp., 1996 WL 296540 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

1. On August 31, 1994, SEI issued a press release stating that it was trading in money market and capital market securities, and would offer other services and products in the near future. (Compl. at ¶ 16.)

2. On September 9, 1994, Harry Georgieff (" Georgieff"), a representative of defendants, informed Jordan that five to seven clients were signed up. (Compl. at ¶ 18.)

3. On November 5, 1994, SEI sent a brochure to Jordan emphasizing the riskless nature of investing through SEI. (Compl. at ¶ 19.)

On November 7, 1994, Jordan entered into a letter of understanding with SEI. Georgieff and Dahl signed the letter on behalf of SEI. The letter agreement confirmed Jordan's authority to represent SEI in the U.K.. Dahl told Jordan that "once an initial client had been signed up through Jordan's efforts, SEI and Jordan would enter into a formal contract." (Compl. at ¶ 20.)

*3 Jordan continued his efforts on behalf of SEI in reliance on the following false statements:

1. At a presentation to Mitsubishi Corporation in London on November 17, 1994, Georgieff stated that SEI had $275 million of client monies under management and anticipated receiving much more from the United States. (Compl. at ¶ 21.)

2. On December 13, 1994, Dahl told Daniel Emerson, soon to be a shareholder of SSL, that AG was expecting to receive $800 million from the U.S. limited partnership, of which SEI was the general partner, by the end of February 1995. (Compl. at ¶ 23.)

Jordan formed SSL in January of 1995. Jordan had written to West on November 20, 1994, to inform him that he was forming SSL for the sole purpose of selling and marketing SEI's investments and securing clients for SEI. Relying on the false representations of Dahl and West, outlined above, several individuals, including Jordan, invested in SSL. Additionally, Jordan became the Chairman and Managing Director of SSL. (Compl. at ¶ 22.)

Jordan and SSL maintained their representation of SEI in reliance on the following misrepresentations:

1. On January 17, 1995, Dahl and Georgieff gave a presentation to SSL shareholders in London at which they stated that: (1) SEI had $275 to $300 million under management; (2) all of these funds came from Europe; (3) SEI acquired these funds during the first three weeks of October, 1994; (4) SEI had computer problems but would begin investment and trading in March, 1995; and (5) SEI had to maintain share capital of 500,000 Swiss francs but was otherwise exempt from Swiss banking and investment regulations because it was acting in an agency capacity. (Compl. at ¶ 24.)

2. On January 27, 1995, Dahl and Georgieff made the same statements at a presentation to potential investor Smedvig Holdings in London. (Compl. at ¶ 25.)

3. On February 10, 1995, at a follow up meeting with Smedvig Holdings, Georgieff, accompanied by an individual named Wolfgang Haller ("Haller"), again repeated these misrepresentations. (Compl. at ¶ 26.)

4. On March 1, 1995, in response to Jordan and SSL's request for SEI's trading record up to that date, Dahl stated: "I have spoken to our trading desk. They estimate that based on the offers we have received since the beginning of the year, they could have generated an estimated 1% per month, plus the fiduciary deposit of 0.50%." (Compl. at ¶ 27.)

5. On March 30, 1995, SEI mailed SSL shareholders a brochure stating that "[t]he transactions arranged by SEI involve intra-day trades[.]" (Compl. at ¶ 28.)

On May 3, 1995, Kenneth MacKay, an employee of SEI, informed Jordan that: (1) the riskless financial product in which SEI was to have traded did not exist; (2) SEI had no client monies under management, its sole funds consisted of $5 million of SEI's own money; (3) Swiss law required SEI to have a "B" banking license in order to trade in eurobonds, and the company had never obtained or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4

Not Reported in F.Supp., 1996 WL 296540 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

tried to obtain such a license; and (4) SEI could not trade on an intra-day basis. In reliance on the false statements "that defendants had furnished to them" prior to May 3, 1995, Jordan and/or SSL had contacted and/or made presentations to approximately 45 businesses and individuals. (Compl. at ¶¶ 31-32.)

### B. Chambers and Sellers

**\*4** In May of 1994, Dahl and Georgieff met with Chambers and Sellers in Switzerland and explained SEI's proposed trading plan. Dahl and Georgieff stressed that trading would be riskless. Dahl and Georgieff also stated that AG was actively managing at least $275 million of clients' funds and had conducted numerous trades on behalf of those accounts. (Compl. at ¶¶ 34-35.)

On November 15, 1994, Chambers and Sellers executed a letter of understanding with AG. The letter outlined the duties and compensation corresponding to Chambers and Sellers' positions as U.K. representatives of AG. Dahl and Georgieff signed the letter agreement on behalf of AG. Previously, Chambers and Sellers had been acting as agents of AG pursuant to an oral agreement. (Compl. at ¶ 36.)

From June 1994, to May 1995, Chambers and Sellers, relying on SEI's assurance that their investment product was riskless, devoted their full attention to securing potential investors for SEI. Dahl and Georgieff applied constant pressure on Chambers and Sellers to develop new clients. (Compl. at ¶ 37.)

Acting under the letter agreement, Chambers and Sellers arranged for and attended approximately 30 meetings with 50 potential investors in the U.K. and Europe. In addition, Chambers and Sellers arranged several meetings between potential clients and Dahl, Georgieff and West. During these meetings, Dahl, Georgieff and West repeatedly maintained that investment with SEI would be riskless. In March of 1995, SEI issued its annual report for 1994, which emphasized the riskless trading conducted by AG. (Compl. at ¶ 38.)

In April of 1995, Ken MacKay of SEI informed Chambers and Sellers that "there were problems at SEI AG and that Dahl had been transferred to the United States." Chambers and Sellers then learned that: (1) AG had experienced difficulty obtaining financing; (2) SEI did not have the proper license from the Swiss authorities to trade in the securities market; (3) SEI had done very little research on whether a riskless trading product could be marketed; and (4) no one at SEI "had sufficient skill at trading this particular product." In May of 1995, "Chambers and Sellers were told that SEI AG's 'riskless trading' operations were on hold and that they were to stop marketing this product." (Compl. at ¶¶ 39-40.)

### 2. The Letters of Understanding

Jordan, Chambers and Sellers entered into identical letters of understanding with AG ("agreement"). [FN4] (Defs.' Mem. Ex. C, F.) Dahl and Georgieff signed the agreement on behalf of AG. (Jordan Agmt. at 3.) The agreement established Jordan, Chambers and Sellers as representatives of AG in the U.K.. (Jordan Agmt. at ¶ 2.) The agreement stated that Jordan, Chambers and Sellers were to "actively sell [AG]'s products in the United Kingdom." (Jordan Agmt. at ¶ 2.) The agreement also contained the following clause:

> FN4. As the Jordan agreement and the Chambers and Sellers agreement contained identical terms and language, the court will refer to the agreements and their provisions in the singular, e.g., "the agreement," "the forum selection clause," etc.. Additionally, for the sake of uniformity, when referring to the language of the agreements, the court will make citations to the "Jordan Agreement."

### 10. Jurisdiction

This letter of understanding shall be governed by Swiss law, place of jurisdiction will be Zurich. **\*5** (Jordan Agmt. at ¶ 10 (emphasis added).) The instant motion revolves around the forum selection aspect of this clause ("forum selection clause").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 5

Not Reported in F.Supp., 1996 WL 296540 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

*DISCUSSION:*

Defendants contend that the court must dismiss this case because the forum selection clause contained in the agreement specifies Zurich, Switzerland as the appropriate forum. Plaintiffs counter that the clause is both unenforceable and inapplicable. The court will address plaintiffs' arguments in turn.

### 1. Enforceability of the Forum Selection Clause

A district court sitting in diversity must determine the effect to be given a contractual forum selection clause by reference to federal not state law. *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 877 (3d Cir.1995). "Because questions of venue and the enforcement of forum selection clauses are essentially procedural, rather than substantive, in nature, federal law applies in diversity cases irrespective of *Erie Railroad Co. v. Tompkins* [.]" *Id.* Adopting the federal common law standard established by the Supreme Court in *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1 (1972), the Third Circuit announced that:
a forum selection clause is presumptively valid and will be enforced by the forum unless the party objecting to its enforcement establishes (1) that it is the result of fraud or overreaching, (2) that enforcement would violate a strong public policy of the forum, or (3) that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable.

*Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190, 202 (3d Cir.), *cert. denied,* 464 U.S. 938 (1983). [FN5] Plaintiffs argue that the court cannot enforce the agreement's forum selection clause because (1) the agreement did not represent the "final" understanding between the parties and (2) discovery will produce evidence showing that the agreement does not bind plaintiffs.

> FN5. In *Scherk v. Alberto-Culver Co.,* 417 U.S. 506 (1974), the Supreme Court clarified the meaning of the term "fraud" as used in the *Bremen* standard. The

Court explained that fraud only warrants the invalidation of a forum selection clause "if the *inclusion of that clause in the contract* was the product of fraud or coercion." *Id.* at 281 n. 14.

### A. Finality of the Agreement

Plaintiffs argue that the forum selection clause is invalid because the agreement in which it appears did not represent the final understanding of the parties. The court rejects this argument. The complaint fails to mention any subsequent agreements between plaintiffs and AG or defendants. Moreover, plaintiffs do not contend that the parties actually entered into new agreements, merely that they intended to do so. That plaintiffs may be able to produce evidence showing that the parties intended to supplant the agreement with new contracts is irrelevant. As plaintiffs concede that the parties never executed new agreements, the existing agreement controls. [FN6]

> FN6. Additionally, as defendants note, under plaintiffs' "finality" argument, contractually bound parties could routinely avoid forum selection clauses by claiming that the agreement containing the clause was not final. Such a result would contravene the strong public policy favoring the enforcement of contracts and, specifically, contractual forum selection clauses.

### B. Validity of the Agreement

Plaintiffs next argue that an "escape clause" in the agreement renders it and its forum selection clause impotent. Plaintiffs direct the court's attention to paragraph 9 of the agreement, which reads as follows:
9. Minimum Target
Mr. Jordan [, Mr. Chambers and Mr. Sellers] agrees to achieve a minimum target of US\$50 million by March 31, 1995. The \$50 million will have to be funded and actively trading by this date, Otherwise [AG] would have the right to reconsider the agency

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                         Page 6

Not Reported in F.Supp., 1996 WL 296540 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

agreement for the United Kingdom. Mr. Jordan [, Mr. Chambers and Mr. Sellers] will not be bound by this agreement if [AG] is not able to perform its trading activities. In addition, either party can cancel this agreement for any reason with a 30 day written notice.

**\*6** (Jordan Agmt. at ¶ 9 (emphasis supplied).) Plaintiffs claim that discovery will reveal that AG was not able to perform its trading activities and, therefore, the agreement, with its forum selection clause, has no power over plaintiffs.

Even assuming plaintiffs will be able to offer evidence illustrating that AG was unable to trade, the court rejects this argument. When read in the context of the entire agreement, the words "this agreement" only refer to paragraph 9's minimum target agreement and, thus, have no impact on the forum selection clause, contained in paragraph 10. Paragraph 9 begins by stating: "Mr. Jordan agrees to achieve a minimum target...." (Jordan Agmt. at ¶ 9 (emphasis added).) Logic dictates that the contested term "this agreement," which appears two sentences later in the paragraph, refers to the agreement to achieve a minimum target. In all other paragraphs, the agreement consistently refers to itself as "this letter of understanding," not "this agreement." *See* Jordan Agmt. ¶¶ 3, 5, 10. For example, paragraph 10 reads: "This letter of understanding shall be governed by Swiss law, place of jurisdiction will be Zurich." (Jordan Agmt. ¶ 10 (emphasis supplied).) The term "this agreement" only appears in paragraph 9. Finally, disregarding the forum selection clause because of a dispute over the meaning of a contractual term would be absurd. Under this reasoning, a party could always avoid the enforcement of a forum selection clause by disputing the interpretation of a critical term in the contract or otherwise arguing that evidence to be produced at a later date will invalidate the contract.

The court concludes by noting that plaintiffs' finality and contract interpretation arguments are improper collateral attacks on the validity of the forum selection clause. These arguments do not implicate the concerns embodied in the *Bremen* standard; plaintiffs make no claim that the clause

resulted from fraud or overreaching, that enforcement would violate public policy or that enforcement would unreasonably inconvenience them. Accordingly, the court finds that plaintiffs have failed to rebut the presumption of validity surrounding the agreement's forum selection clause and, therefore, the court will enforce the clause.

### 2. Applicability of the Forum Selection Clause

Plaintiffs maintain that the agreement's forum selection clause does not apply to the instant matter because plaintiff SSL and defendants did not sign the agreement. Defendants respond by arguing that their and SSL's status as nonsignatories is of no consequence.

Forum selection clauses bind nonsignatories that are closely related to the contractual relationship or that should have foreseen governance by the clause. *See Hugel v. Corporation of Lloyd's,* 999 F.2d 206, 209-10 (7th Cir.1993) (binding corporations owned and controlled by contracting party); *Manetti-Farrow, Inc. v. Gucci America, Inc.,* 858 F.2d 509, 514 n. 5 (9th Cir.1988) (binding parent companies of contracting party, as well as individual directors); *Coastal Steel Corp.,* 709 F.2d at 202-03 (binding third party beneficiary). The complaint and the agreement reveal an umbilical link between SSL and the Jordan/AG contractual relationship. On November 16, 1994, Jordan and AG entered into the agreement. (Jordan Agmt. at 3.) The agreement designated Jordan as a representative of AG and it charged him with identifying and referring potential clients to AG. (Jordan Agmt. at ¶¶ 1-2.) Shortly after entering into the agreement, Jordan formed SSL and became its chairman and managing director. (Compl. at ¶ ¶ 20, 22.) According to the complaint, Jordan stated that SSL was "dedicated to sales and marketing for SEI," and that the company's purpose was to "find clients for SEI, and provided that we are sufficiently encouraged by this, this is all it will do." (Compl. at ¶ 22 (internal quotation marks omitted).) As Jordan invested SSL, a company that he managed, with a mission identical to his obligations under the agreement, the court concludes that SSL was closely related to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                              Page 7

Not Reported in F.Supp., 1996 WL 296540 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Jordan/AG contractual relationship and should have foreseen that the agreement's forum selection clause would bind it.

*7 The court next considers whether defendants may invoke the forum selection clause. In *Coastal Steel,* the Third Circuit held that the presence of a nonsignatory defendant does not render a forum selection clause inapplicable where (1) that defendant consents to be governed by the clause and (2) the pleadings do not allege that the conduct of that defendant caused a harm separate from that allegedly caused by a signatory. *Coastal Steel Corp.,* 709 F.2d at 203. The instant defendants satisfy this standard. First, defendants "expressly consent to submit to service of process and personal jurisdiction in Switzerland." (Defs.' Mem. at 22.) Second, while the complaint indicates that defendants had some direct involvement in the alleged fraud, it certainly does not claim that their actions caused any harm distinct from that allegedly caused by AG. [FN7] On the contrary, the complaint accuses defendants and AG of making the same misrepresentations. For example, plaintiffs assert that, at various times, West, SEI and AG all represented that the proposed investment would be without risk. [FN8] That the complaint repeatedly refers to AG and its principals as "agents" of or " under the control" of defendants, *e.g.,* Compl. at ¶ ¶ 11, 17, 18, 23, 24, provides further proof that plaintiffs regard defendants and AG as a collective entity responsible for a collective harm. [FN9] For these reasons, under *Coastal Steel,* plaintiffs cannot claim that defendants' status as nonsignatories of the agreement renders inapplicable the forum selection clause contained therein. [FN10]

> FN7. The conduct of AG, of course, includes the actions of Dahl and Georgieff, agents of AG.

> FN8. Plaintiffs argue that discovery will reveal that defendants hosted meetings in Pennsylvania and communicated with plaintiffs via telephone and mail. Regardless, proof of these events will not change the fact that plaintiffs' complaint does not assert that defendants' conduct

caused a harm separate from that allegedly caused by AG.

> FN9. At a hearing on May 23, 1996, plaintiffs argued that they will be able to produce evidence showing that defendants directly instructed AG to make the alleged misrepresentations. Even if plaintiffs could establish this as fact, it would only serve to strengthen the nexus between defendants and AG, which, in turn, would lend support to the court's conclusion that plaintiffs do not-because they cannot-distinguish between the harm allegedly caused by defendants and that allegedly caused by AG. If defendants had such puppetlike control over AG, perhaps they "instructed" AG to enter into the agreement with plaintiffs; at the very least, it would not be unreasonable to assume that defendants were aware of the agreement and its ramifications.

> FN10. Although plaintiffs never raised this argument, the court notes that the forum selection clause governs the instant matter even though plaintiffs seek to recover for fraud and negligent misrepresentation. The public policy favoring the enforcement of forum selection clauses " requires that they not be defeated by artful pleading of claims.... [W]here the relationship between the parties is contractual, the pleading of alternate non-contractual theories of liability should not prevent enforcement of such a bargain." *Coastal Steel Corp.,* 709 F.2d at 202. In the instant matter, the agreement embodied the relationship between the parties. Were it not for this contractual relationship, plaintiffs would not have been in a position to allege that defendants' misrepresentations caused them injury. Plaintiffs' claims grew out of the relationship defined by the agreement and, therefore, the agreement's forum selection clause governs plaintiffs' claims.

The court concludes its analysis of nonsignatory

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 296540 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 8

defendants' ability to invoke forum selection clauses with a discussion of the Seventh Circuit's recent decision in *Frietsch v. Refco, Inc.,* 56 F.3d 825 (7th Cir.1995), a case factually analogous to the instant matter. In that case, Refco, a U.S. commodities broker, entered into a venture with several German businessmen to establish commodity pools in Germany. The German businessmen owned three German corporations, which promoted and solicited investment in the commodity pools. German trustees managed the pools. Plaintiffs, various citizens and residents of Germany, had invested in the pools pursuant to contracts with the German trustees and promoters. These contracts contained forum selection provisions designating Germany as the place of jurisdiction. When plaintiffs sued Refco for fraud, Refco, a nonparty to the investment contracts, sought to invoke the forum selection clauses contained in those contracts. *Refco, Inc.,* 56 F.3d at 827.

Writing for the majority in *Refco,* Chief Judge Posner invoked the principles articulated in *Hugel, Manetti-Farrow,* and *Coastal Steel,* noting that " courts in this country ... enforce forum selection clauses in favor of non-parties closely related to a signatory." *Id.* Posner then stated that this rule "can be given meaning by reference to the principle of mutuality." *Id.* Posner explained as follows:
*8 Suppose the plaintiffs wanted to sue Refco in Germany. Since the basis of their claim is that Refco totally controlled the promoters and trustees who are the nominal signatories of the investment contracts, the plaintiffs could argue as a justification for enforcing the forum selection clause in the investment contracts that the clause binds Refco as the secret principal of the signatories. If so, mutuality requires that Refco be allowed to invoke the clause. Otherwise the plaintiffs would have a choice of venues but Refco would not, and there is no reason for such an asymmetry of procedural choices. All Refco is doing in invoking the forum selection clause to which it is not a party is accepting one of the premises of the plaintiff's [sic] suit-that the promoters and trustees are indeed simply cat's paws of Refco-and pointing out that the implication is that the investment contracts, including the forum selection clause, are really between the plaintiffs and Refco.

*Id.* at 827-28. Based on this analysis, the Seventh Circuit held that Refco was "closely related" to the signatories of the investment contracts and, therefore, could invoke the forum selection clause. *Id.* 826.

As in *Refco,* plaintiffs' claims rest on the theory that defendants, domiciled in the United States, directly controlled the activities of the Swiss subsidiary AG. In their complaint, plaintiffs repeatedly state that AG and its principals were, at all times, acting as " agents of defendants" or were "under the direct supervision and control of defendants[.]" *E.g.,* Compl. at ¶¶ 11, 17, 18, 23, 24. By invoking the forum selection clause, defendants are merely acknowledging plaintiffs' implication that the agreement was between plaintiffs and defendants, not between plaintiffs and AG. [FN11] Thus, in addition to the rule announced by the Third Circuit in *Coastal Steel,* the Seventh Circuit's mutuality analysis in *Refco* compels the court to conclude that defendants may invoke the forum selection clause even though they did not sign the agreement. For these reasons, the court will apply the clause in the instant matter.

> FN11. Plaintiffs clearly make this implication in their complaint. Paragraph 20 of the complaint states that Jordan signed the agreement, which "had been prepared by SEI and previously signed by Dahl on behalf of and as agent for SEI." (Compl. at ¶ 20.) The agreement, however, explicitly states that it is between Jordan and AG, not between Jordan and SEI, and that Dahl signed on behalf of AG, not on behalf of SEI. (Jordan Agmt. at 3.)

*CONCLUSION:*

As explained above, the court finds plaintiffs' arguments regarding the enforceability and applicability of the forum selection clause unpersuasive. The court concludes that the clause governs the instant matter and, therefore, Zurich, Switzerland is the proper forum for this dispute. Accordingly, the court will dismiss plaintiffs' complaint without prejudice pursuant to Rule

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                  Page 9

Not Reported in F.Supp., 1996 WL 296540 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

12(b)(6). An appropriate order follows. [FN12]

> FN12. As the court has resolved
> defendants' motion on the basis of the
> forum selection clause, it need not address
> defendants' *forum non conveniens*
> argument. However, without conducting a
> full blown analysis, the court notes that the
> following factors strongly counsel in favor
> of dismissing the case on *forum non
> conveniens* grounds: (1) virtually all of the
> alleged misrepresentations occurred in
> Switzerland and the U.K.; (2) the forum
> selection clause specifies Zurich,
> Switzerland as the place of jurisdiction;
> (3) plaintiffs are residents of Sweden and
> the U.K. and, therefore, Zurich would be at
> least as convenient a forum for them as
> Pennsylvania; (4) defendants,
> Pennsylvania residents, prefer Zurich; (5)
> neither plaintiffs nor defendants have any
> control over former AG employees
> Georgieff and Haller, and former AG
> consultant de Bekassy, three of the four
> nonparties alleged to have made the
> misrepresentations at issue; however,
> these individuals reside in Switzerland
> and, therefore, would be subject to
> compulsory process in that country; (6) as
> former AG president Dahl, the fourth
> nonparty allegedly responsible for the
> misrepresentations, resides in Sweden,
> producing him as a witness would be
> equally difficult in Switzerland and the
> United States; and (7) consistent with item
> (1) above, nearly all of the many
> individuals to whom Dahl, Georgieff,
> Haller and de Bekassy allegedly made oral
> misrepresentations-essential defense
> witnesses-reside in the U.K. and likely
> would consent more readily to appear in
> nearby Switzerland than in distant
> Pennsylvania.

### ORDER

AND NOW, this day of June, 1996, upon
consideration of defendants' motion to dismiss the
complaint and memoranda of law in support
thereof, and plaintiffs' response thereto, IT IS
HEREBY ORDERED that:

1. defendants SEI and West have 20 days from the
date of this order to execute an affidavit
memorializing their consent to personal jurisdiction
and service of process in Switzerland; and

*9 2. provided that defendants SEI and West
comply with the above condition, the motion is
GRANTED and the complaint is DISMISSED
WITHOUT PREJUDICE. 1332(a)(2). Rule
12(b)(3) governs dismissal for lack of venue.
While courts have granted Rule 12(b)(3) motions to
dismiss on the basis of a forum selection clause,
*see, e.g., Riley v. Kingsley Underwriting Agencies,
Ltd.,* 969 F.2d 953, 956 (10th Cir.), *cert. denied,*
506 U.S. 1021 (1992), it is not clear that this is a
correct application of Rule 12(b)(3). Statute, not
contract, ordinarily determines venue. Here, venue
is proper under 28 U.S.C. § 1391(a)(2), as both
defendants reside in the Eastern District of
Pennsylvania. Rule 12(b)(3), therefore, may not be
a proper means for enforcing the contractual forum
selection clause that defendants are attempting to
invoke in their motion. Accordingly, the court will
decide defendants' motion to dismiss under Rule
12(b)(6). *See Lambert v. Kysar,* 983 F.2d 1110,
1112 n. 1 (1st Cir.1993) (stating that motions for
dismissal based upon forum selection clauses are
founded on Rule 12(b)(6) not Rule 12(b)(3)).

E.D.Pa.,1996.
Jordan v. SEI Corp
Not Reported in F.Supp., 1996 WL 296540
(E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:96cv01616 (Docket) (Mar. 01, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1

Not Reported in F.Supp.2d, 2004 WL 2368007 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
    United States District Court,S.D. New York.
        NOVARTIS CORPORATION, Novartis
    Pharmaceuticals Corporation, and Novartis
        International AG, Plaintiffs,
                    v.
    DR. REDDY'S LABORATORIES, LTD. and Dr.
    Reddy's Laboratories, Inc., Defendants.
            **No. 04 Civ.0757 SAS.**

                Oct. 21, 2004.

Dimitrios T. Drivas, Jeffrey J. Oelke, Catherine
Lacavera, White & Case LLP, New York, New
York, for Plaintiffs.
Frank D. Rodriguez, Vijayant Pawar, Budd Larner,
P.C., Short Hills, New Jersey, for Defendants.

            OPINION AND ORDER

SCHEINDLIN, J.

            I. INTRODUCTION

*1 Novartis Corporation, Novartis Pharmaceuticals
Corporation and Novartis International AG
(collectively, "Novartis") bring this patent
infringement suit against Dr. Reddy's Laboratories,
Ltd. and Dr. Reddy's Laboratories, Inc.
(collectively, "DRL"). [FN1] Novartis claims that
DRL's New Drug Application ("NDA") to the
United States Food and Drug Administration ("FDA
") seeking approval to market amlodipine maleate
and benazepril hydrochloride combination capsules (
"DRL's Combination Capsules") infringes on a
patent owned by Novartis. [FN2] DRL now moves
for an order staying these proceedings pending the
decision by the FDA on its Administrative Stay of
Action (the "FDA Stay") concerning DRL's New
Drug Application for its amlodipine maleate
product (AmVaz®), which may moot this action.

FN3 Novartis opposes DRL's motion to stay the
litigation. [FN4] For the reasons set forth below,
DRL's motion to stay these proceedings is granted.

        FN1. *See* Complaint ¶ 20.

        FN2. *See id.*

        FN3. *See* Memorandum of Law in Support
        of DRL's Motion for Stay ("DRL Mem.")
        at 1. *See also* 2/4/04 Food and Drug
        Administration Administrative Stay of
        Action ("FDA Stay"), Ex. A to Pawar Decl.

        FN4. *See* Novartis' Opposition to DRL's
        Motion to Stay the Case ("Novartis Opp.")
        at 9.

            II. BACKGROUND

    A. New Drug Applications Under 21 U.S.C. §
                355(b)(2)

Section 355 of Title 21 of the United States Code
authorizes abbreviated new drug applications which
shorten the time and effort needed to obtain
marketing approval from the FDA. [FN5] An
abbreviated application may be filed for a generic
drug that is the same as a drug previously approved
(referred to as a "pioneer drug") or that differs from
the pioneer drug in specified ways. [FN6] The
abbreviated application allows an applicant to
substitute bioequivalence data for the extensive
animal and human studies of safety and
effectiveness that must accompany a full new drug
application. [FN7]

        FN5. *See Eli Lilly & Co. v. Medtronic, Inc.,*
        496 U.S. 661, 676 (1990).

        FN6. *See id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                              Page 2

Not Reported in F.Supp.2d, 2004 WL 2368007 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

FN7. *See id.*

In order to protect against patent infringement, applicants must file with the FDA the patent number and expiration date of any patent which claims the drug that is the subject of the application or which claims a method of using such drug with respect to which a claim of patent infringement could reasonably be asserted. [FN8] Upon approval of a NDA or receipt of supplemental patent information, the FDA publishes this information in a listing called "Approved Drug Products with Therapeutic Equivalence Evaluations" (commonly known as the "Orange Book") pursuant to 21 U.S.C. § 355(b)(1). [FN9]

> FN8. *See id.; see also* 21 U.S.C. § 355(b)(1).
>
> FN9. *See Del Greco v. CVS Corp.,* No. 03 Civ. 1262, 2004 WL 2211600 at *15 (S.D.N.Y. Sept. 22, 2004).

[Abbreviated applications] are required to contain one of four certifications with respect to each patent named in the pioneer drug application: (i) that such patent information has not been filed, (ii) that such patent has expired, (iii) the date on which such patent will expire, or (iv) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted." [FN10]

> FN10. *Medtronic,* 496 U.S. at 677 (quotation marks omitted). *See also* 21 U.S.C. §§ 355(b)(2)(A)(i)-(iv).

This certification determines the date on which approval of the new drug application can take effect. [FN11] An applicant who makes the fourth certification (a "Paragraph (iv) Certification") is required to give notice to the holder of the patent alleged to be invalid or not infringed, stating that an application has been filed seeking approval to engage in the commercial manufacture, use, or sale of the drug before the expiration of the patent and including a detailed statement of the factual and

legal basis for the applicant's opinion that the patent is not valid or will not be infringed. [FN12] If the patent owner brings a lawsuit for infringement within forty-five days of receiving notice of the certification, then approval of the NDA may only be made "upon the expiration of the thirty-month period beginning on the date of the receipt of the notice" unless there is a court determination that " the patent is invalid or not infringed (including any substantive determination that there is no cause of action for patent infringement or invalidity)." [FN13] If the patent owner does not initiate a lawsuit within forty-five days, approval of the NDA may become effective immediately. [FN14]

> FN11. *See Medtronic,* 496 U.S. at 677. "If the applicant makes either the first or the second certification, approval can be made effective immediately. If the applicant makes the third certification, approval of the application can be made effective as of the date the patent expires." *Id.*
>
> FN12. *See* 21 U.S.C. § 355(b)(3).
>
> FN13. 21 U.S.C. § 355(c)(3)(C). *See also Medtronic,* 496 U.S. at 678 (stating that section 271(e)(2) of Title 35 of the United States Code creates "a highly artificial act of infringement" consisting solely of submitting a NDA containing a Paragraph (iv) Certification that is in error as to whether the new drug violates the relevant patent).
>
> FN14. *See* 21 U.S.C. § 355(c)(3)(C).

### B. Novartis' '802 Patent

**\*2** The United States Patent and Trademark Office issued U.S. Patent No. 6,162,802 (the " '802 Patent" ) on December 19, 2000. [FN15] The '802 Patent, entitled "Synergistic Combination Therapy Using Benazepril and Amlodipine for the Treatment of Cardiovascular Disorders and Compositions Therefor," covers a range of ratios of specified amounts of benazepril and amlodipine (or pharmaceutically acceptable salts of either or both),

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2368007 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

used for treating hypertension in humans. [FN16] The '802 Patent has been assigned to Novartis Corporation, the current owner of the patent. [FN17] Novartis Corporation exclusively licensed the '802 Patent to Novartis International AG, which in turn exclusively licensed the '802 Patent to Novartis Pharmaceuticals Corporation. [FN18] The '802 Patent is listed in the Orange Book. [FN19]

> FN15. *See* Complaint ¶ 10.
>
> FN16. *See id.* ¶¶ 10, 12.
>
> FN17. *See id.* ¶ 11.
>
> FN18. *See id.*
>
> FN19. *See id.* ¶ 14.

### C. DRL's New Drug Application for Amlodipine Maleate

In December 2001, DRL filed a NDA under 21 U.S.C. § 355(b)(2) seeking approval to market AmVaz®, a heart medicine, whose active ingredient is a chemical commonly known as amlodipine maleate. [FN20] Pfizer, Inc. ("Pfizer") sued DRL on June 12, 2002 in the District of New Jersey alleging that AmVaz® infringed U.S. Patent No. 4,572,909, which covers Pfizer's amlodipine besylate product. [FN21] The FDA initially approved DRL's amlodipine maleate product. [FN22] Then Pfizer sued the FDA in the District of Columbia to overturn the approval. [FN23] DRL intervened in that action. [FN24]

> FN20. *See* 7/23/04 Declaration of Vijayant Pawar in Support of DRL's Motion for a Stay of Proceedings ("Pawar Decl.") ¶ 2; DRL Mem. at 2.
>
> FN21. *See* Pawar Decl. ¶ 3.
>
> FN22. *See id.* ¶ 10.
>
> FN23. *See id.*

> FN24. *See id.*

On February 4, 2004, in light of questions raised about the data used in DRL's NDA for the amlodipine maleate product, the FDA issued the FDA Stay. The FDA action stays the effective date of the FDA's approval of the amlodipine maleate product, and prohibits DRL from marketing any such product until the FDA has reevaluated the application and determined that the drug has been shown to be safe and effective. [FN25] Both Pfizer's suit against DRL in the District of New Jersey and Pfizer's suit against the FDA in District of Columbia have been stayed pending the lifting of the FDA Stay. [FN26]

> FN25. *See id.* ¶ 11. *See also* FDA Stay.
>
> FN26. *See* Pawar Decl. ¶¶ 12-14; 5/25/04 Order of the United States District Court for the District of New Jersey, Ex. C. to Pawar Decl.; 4/6/04 Order of the United States District Court for the District of Columbia, Ex. B. to Pawar Decl.

### D. Novartis' Dispute with DRL

On December 23, 2003, Novartis received notice that DRL had filed a NDA with the FDA seeking approval to market DRL's Combination Capsules. [FN27] On February 2, 2004, Novartis brought the present suit against DRL alleging that DRL's Combination Capsules (containing amlodipine maleate and benazepril hydrochloride) infringe on Novartis' Lotrel® (a combination of amlodipine besylate and benazepril hydrochloride), which is covered by the '802 patent. [FN28] Novartis' suit triggered the thirty-month stay of approval by the FDA of the NDA for DRL's Combination Capsules. [FN29] DRL counterclaimed seeking a declaration that DRL's filing of a NDA seeking FDA approval of DRL's Combination Capsules does not infringe any valid and enforceable claim of Novartis' '802 patent. [FN30] DRL now moves to stay these proceedings pending the completion of the FDA's reevaluation of the safety and efficacy of DRL's amlodipine maleate product.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 4

Not Reported in F.Supp.2d, 2004 WL 2368007 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

FN27. *See* Complaint ¶ 17.

FN28. *See id.* ¶ 20.

FN29. *See* 21 U.S.C. § 355(c)(3)(C).

FN30. *See* Answer of DRL to Novartis'
Complaint and Counterclaims ¶ 65.

### III. LEGAL STANDARD

**\*3** "[T]he power to stay proceedings is incidental to
the power inherent in every court to control the
disposition of the causes on its docket with
economy of time and effort for itself, for counsel,
and for litigants. How this can best be done calls for
the exercise of judgment, which must weigh
competing interests and maintain an even balance."
FN31 When faced with a motion to stay patent
infringement litigation pending an administrative
decision, courts have considered (1) whether a stay
will simplify the issues in question and promote
judicial economy; (2) whether a stay would unduly
prejudice or present a clear tactical disadvantage to
the non-moving party; and (3) how far the litigation
has already progressed. FN32

FN31. *Landis v. North Am. Co.*, 299 U.S.
248, 254 (1936).

FN32. *See Aerotel, Ltd. v. IDT Corp.*, No.
03 Civ. 6496, 2003 WL 23100263
(S.D.N.Y. Dec. 30, 2003).

### IV. DISCUSSION

#### A. A Stay Will Simplify the Issues and Promote
Judicial Economy

A stay of these proceedings pending the completion
of the FDA's reevaluation will simplify the issues
before this Court and promote judicial economy. If
the FDA Stay remains in effect or if the FDA
withdraws its approval of DRL's amlodipine
maleate product, DRL would not be permitted to
market its Combination Capsules, which contain
amlodipine maleate. Thus, the FDA's decision may

moot the case before this Court. FN33 DRL is
requesting this stay relatively early in the litigation,
as discovery has just begun. FN34 A stay of this
case will therefore conserve judicial and party
resources by avoiding potentially needless and
expensive discovery. FN35

FN33. *See Alberta Gas Chems., Ltd. v.
Celanese Chem. Co.*, 650 F.2d 9, 14 (2d
Cir.1981) (remanding case to the trial
court with a direction for a stay pending an
administrative agency's decision) ("We
believe that the Commission's decision ...
will materially affect, or perhaps
definitively conclude, the federal action
now before us.").

FN34. *See Aerotel*, 2003 WL 23100263 at
\*2 (finding that a stay of litigation is
warranted where "litigation has just begun"
); *ASCII Corp. v. STD Entertainment USA,
Inc.*, 844 F.Supp. 1378, 1381
(N.D.Cal.1994) (granting a stay of
litigation pending the outcome of the U.S.
Patent and Trademark Office's
reexamination or reissuance proceedings
where the parties were in "the initial stages
of the lawsuit").

FN35. *See SmithKline Beecham Corp. v.
Apotex Corp.*, No. Civ.A. 99-CV-4304 et.
al., 2004 WL 1615307 at \*8 (E.D.Pa. July
16, 2004) ("If we decline to stay these
proceedings, there is substantial risk that
the parties will engage in costly,
time-consuming discovery that might
ultimately be unnecessary.").

#### B. A Stay Will Not Unduly Prejudice Novartis If
Novartis Is Granted a Commensurate Extension of
the Thirty-Month Stay of Approval

Novartis contends that a stay of these proceedings
will be prejudicial to its right to seek a court
determination of its patent rights within the
thirty-month period provided for by section
355(c)(3)(C), unless Novartis is given a
commensurate extension of that period. Novartis

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2368007 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

argues that it would be an abuse of the statutory scheme to allow a new drug applicant making a Paragraph (iv) Certification to benefit from a stay of litigation by letting the clock run on the thirty-month stay of FDA approval of the NDA.

DRL does not object to tolling the thirty-month stay of approval of DRL's Combination Capsules during the pendency of a stay of these proceedings. [FN36] Further, the Court has the discretion to extend the thirty-month period if "either party to the action failed to reasonably cooperate in expediting the action." [FN37] DRL cannot feasibly argue that it is reasonably cooperating in expediting the action when it has asked the court to stay the proceedings. Therefore, the thirty-month period will be tolled during the stay of these proceedings.

> FN36. *See* DRL's Reply to Novartis' Opposition to Motion for Stay ("DRL Reply") at 2.

> FN37. 21 U.S.C. § 355(c)(3)(C). *See also Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.,* No. IP99-0038-C-H/G, 2001 WL 238090 (S.D.Ind. March 8, 2001) (granting extension of thirty-month stay until the entry of final judgment where drug applicant that made a Paragraph (iv) Certification failed to meet the case management deadline for serving its expert witness reports).

With an extension of the thirty-month period, Novartis will not be disadvantaged by a stay of these proceedings. Novartis argues that there is no evidence concerning when the FDA is likely to take action and that DRL's Paragraph (iv) Certification challenge to the '802 Patent "cast[s] a cloud over [the] patent that Novartis is anxious to clear." [FN38] However, DRL is prohibited from marketing any product containing amlodipine maleate during the FDA Stay, thereby protecting Novartis from suffering economic harm during the pendency of a stay of these proceedings. Also, it is in DRL's interest to obtain quick approval to market its product. Consequently, there is no justification for requiring the parties to move forward with

discovery when the FDA's decision regarding its reevaluation of the drug may moot these proceedings.

> FN38. Novartis Mem. at 10, 13.

### V. CONCLUSION

*4 For the foregoing reasons, DRL's motion for a stay pending the completion of the FDA's reevaluation of DRL's amlodipine maleate product is granted. The parties are to immediately advise the Court of any action taken by the FDA regarding the NDA for DRL's amlodipine maleate product. Further, the thirty-month limitation on FDA approval of DRL's Combination Capsules is tolled during the pendency of this stay. The Clerk of the Court is directed to close this motion [# 14 on the docket sheet] and transfer this action to the suspense docket pending further order of the Court.
SO ORDERED:

S.D.N.Y.,2004.
Novartis Corp. v. Dr. Reddy's Laboratories, Ltd.
Not Reported in F.Supp.2d, 2004 WL 2368007 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 3567770 (Trial Pleading) Answer of Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc. to Plaintiffs' Complaint and Counterclaims (Feb. 23, 2004)
• 1:04cv00757 (Docket) (Feb. 02, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1043193 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
In re: TCW/CAMIL HOLDING L.L.C., Debtor.
TCW/CAMIL HOLDING L.L.C., Plaintiff,
v.
FOX HARON & CAMERINI LLP, Defendant.
**No. 03-10717, 03-53929, 03-1154-SLR.**

April 30, 2004.

MEMORANDUM ORDER

ROBINSON, J.
*1 At Wilmington this 30th day of April, 2004, having reviewed defendant's motion to transfer venue and the papers submitted in connection therewith;

IT IS ORDERED that defendant's motion (D.I.18) is denied, for the reasons that follow:

1. On June 17, 2003, plaintiff filed an adversary complaint in the United States Bankruptcy Court for the District of Delaware where plaintiff's bankruptcy case is presently pending. Plaintiff alleges that defendant, who served as its former attorneys, committed legal malpractice in the course of providing legal representation and advice during a pre-bankruptcy International Chamber of Commerce arbitration proceeding arising from a failed joint venture to acquire control of the largest Brazilian producer of rice, Josapar S.A.. FN1 (D.I. 1, ex. A at ¶ 1) Plaintiff specifically complains that defendant's actions during the arbitration caused it to be responsible under joint and several liability when it otherwise would not have been subjected to this form of liability. FN2 (*Id.* at 3) On December 19, 2003, defendant moved to withdraw the reference of the adversary proceeding from Bankruptcy Court. (*Id.* at 1) The court granted this motion on January 21, 2004. (D.I.6) Trial is

scheduled for November 2004. (D.I.14)

> FN1. Plaintiff and IRHE Holdings ("IRHE") funded the amounts of $58.75 million and $10.4 million, respectively, into Camil Holding, LLC as part of a joint venture. (D.I. 19, ex. A at 2) Camil is owned by plaintiff and Garial S.A. ("Garial"). (*Id.*) Through Camil, plaintiff, IRHE, and Garial sought to obtain a majority interest in Josepar S.A.. (D.I. 19 at 3) When the joint venture failed to obtain this interest, IRHE filed the arbitration to force Camil to unwind its $10.4 million investment. (D.I. 1, ex. A at 3)

> FN2. In the arbitration proceedings, IRHE obtained a full judgment in its favor, and plaintiff alleges that defendant stipulated to joint and several liability for it, Camil, and Garial. (*Id.*) IRHE decided to collect judgment from plaintiff alone. As a result, plaintiff asserts that it was forced to file for Chapter 11 bankruptcy protection to preserve its assets.

2. Plaintiff is a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York. Defendant is a limited liability partnership registered in the State of New York with offices in New York City.

3. Defendant moves the court to transfer this matter pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the Southern District of New York. Section 1404(a) provides: "For the convenience of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a) (2003). A plaintiff's choice of forum is to be accorded substantial weight and courts should only transfer venue if the defendant is truly regional in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 2

Not Reported in F.Supp.2d, 2004 WL 1043193 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

character. *See Bergman v. Brainin,* 512 F.Supp. 972, 973 (D.Del.1981) (citing *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970)). A defendant has the burden of establishing that "the balance of convenience of the parties and witnesses strongly favors" transfer. *Id.* Accordingly, "defendants brought into suit in Delaware must prove that litigating in Delaware would pose a 'unique or unusual burden' on their operations" for a Delaware court to transfer venue. *See Wesley-Jessen Corp. V. Pilkington Visioncare, Inc.,* 157 F.R.D. 215 (D.Del.1993). A motion to transfer venue may also be granted if there is a related case which has been first filed or otherwise is the more appropriate vehicle to litigate the issues between the parties. *See American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.,* 1999 WL 615175, *5 (D.Del.1999).

4. In reviewing a motion to transfer venue, courts have not limited their consideration to the three factors enumerated in § 1404(a) (i.e., convenience of parties, convenience of witnesses, and interests of justice). Rather, courts have considered "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995) (internal quotations and citation omitted). The Third Circuit, in fact, has provided a list of factors to assist district courts in determining "whether, on balance, the litigation would more conveniently proceed and the interests of justice [would] be better served by a transfer to a different forum." *Id.* These factors entail six private and five public interests. Private interests include: (1) the plaintiff's forum preference as manifested by the plaintiff's original forum choice; (2) the defendant's forum preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of the books and records to the extent that the files could not be produced in the alternative forum. *Id.* Public interests include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy,

expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; and (5) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.*

**\*2** 5. In considering the private interest factors under *Jumara,* the court, consistent with Third Circuit precedent, adheres to the notion that transfer is not to be liberally granted and plaintiffs' choice of forum is a paramount consideration. Venue is proper in Delaware as plaintiff is incorporated under the laws of the State of Delaware. Nevertheless, the District of Delaware is not plaintiff's "home turf," since it maintains its principal place of business in New York. In this sense, it appears to be more convenient to both the plaintiff and defendant to try the instant litigation in the Southern District of New York. Indeed, this court previously recognized that "when the plaintiff has chosen to bring suit in a district that is not plaintiff's 'home turf' and that has no connection to any acts giving rise to the lawsuit, convenience to the plaintiff is not as great as it would be were plaintiff litigating at or near plaintiff's principal place of business or at the site of activities at issue in the lawsuit." *Burstein v. Applied Extrusion Techs. Inc.,* 829 F.Supp. 8 (D.Del.1992). Moreover, the locus of the alleged legal malpractice occurred in New York because the underlying arbitration was conducted there. The majority of the witnesses with discoverable information also are located in New York, though the court notes that Wilmington, Delaware is only 130 miles from New York City and is easily accessible by plane, train, or automobile. *See Praxair, Inc. v. ATMI, Inc.,* 2004 WL 883395, *2 (D.Del.2004) (discussing proximity, transportation, and hotel options between New York City, New York and Wilmington, Delaware). On this basis, the court concludes that the private factors under *Jumara* weigh in favor of transferring the case at bar to the United States District Court for the Southern District of New York.

6. In considering the public interest factors under *Jumara,* the court is strongly persuaded by the fact that defendant argued to both the Bankruptcy Court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2004 WL 1043193 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

and this court when it moved to withdraw the reference that the District of Delaware was the most efficient and expeditious forum in which to litigate this matter. Defendant, in fact, stated: " Considerations of judicial economy, expeditiousness of the proceeding, and preservation of debtors' and creditors' resources also support withdrawal of reference [to the District of Delaware]." (D.I. 1 at 7) Given its prior contention, defendant now cannot attempt to turn the table and argue for a transfer to the United States District Court for the Southern District of New York. Additionally, the parties have taken significant steps to advance the instant litigation in the District of Delaware. Defendant answered the complaint and filed a motion to dismiss and a motion for judgment on the pleadings prior to filing the motion at bar. The parties likewise exchanged initial disclosures and are set to explore settlement with the magistrate judge. Also, trial is set to occur in six months. Transfer of venue to the United States District Court for the Southern District of New York inevitably will delay this litigation, since that court is one of the largest and busiest courts in the federal system. Furthermore, the court finds that venue in the District of Delaware will facilitate the pending bankruptcy proceeding. The court, therefore, concludes that the public interest factors under *Jumara* favor maintaining venue in the District of Delaware.

**\*3** 7. On balance, the court finds that the public interest factors outweigh the private interest factors. The court, as a result, concludes that defendant fails to prove that litigating in the District of Delaware would pose a unique or unusual burden to merit transfer of venue.

D.Del.,2004.
In re TCW/Camil Holding L.L.C.
Not Reported in F.Supp.2d, 2004 WL 1043193 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:03CV01154 (Docket) (Dec. 19, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.